**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| ARTHUR J. GALLAGHER & CO., | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:25-cv-00885-RCY |
| | ) | |
| ALAN MARKFELD,<br>CHRIS GEARY, and<br>GRANITE WEALTH MANAGEMENT, LLC, | ) | |
| | ) | |
| *Defendants*. | ) | |

**GALLAGHER'S RESPONSE IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**

Plaintiff Arthur J. Gallagher & Co. ("Gallagher") submits this response brief in opposition to Defendants Alan Markfeld, Chris Geary (collectively the "Individual Defendants"), and Granite Wealth Management, LLC's ("GWM") Memorandum in Support of Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 61) ("Motion"). Defendants seek to dismiss Counts I, II, III, VI, and VII[1] of Gallagher's First Amended Complaint ("FAC") pursuant to Rules 12(b)(1) and 12(b)(6). Gallagher respectfully requests that the Court deny Defendants' motion and in support thereof states as follows:

## INTRODUCTION

While admitting that Gallagher is not a member of the Financial Industry Regulatory Authority ("FINRA") or subject to its jurisdiction, Defendants argue that Gallagher's Complaint should nonetheless be dismissed based on FINRA's inapplicable arbitration procedures.

[1] Defendants do not seek to dismiss Gallagher's fiduciary duty claims in Counts IV or V. Pursuant to the December 12, 2025, Preliminary Injunction Order in this action, the Court found that Gallagher had a likelihood of success of prevailing on those claims. *See* ECF No. 50 at 1.

Defendants do not point to any arbitration agreement or law requiring non-members like Gallagher to arbitrate, but to a policy favoring the submission of FINRA members' customer claims to FINRA's arbitration forum. This policy argument is not a valid basis for compelling arbitration, let alone dismissing a complaint. To be clear, as Defendants readily admit when it suits them, Gallagher does not and cannot offer brokerage accounts, and Gallagher's claims involve Defendants' roles as investment advisor employees, not broker-dealers.

Defendants also assert the contradictory argument that, as Gallagher is not a broker-dealer or a FINRA member, it somehow lacks standing over its claims. Thus, Defendants argue that Gallagher is subject to FINRA for arbitration purposes, but not subject to FINRA when it concerns standing to enforce Gallagher's own employment agreements or fiduciary duties owed to Gallagher. The consequence of this twisted logic is Gallagher would be left with no forum for Gallagher to enforce its claims. Gallagher is no doubt the aggrieved party here, and it does not assert any claims on behalf of customers or any other company, including Osaic. No customer is a party to this lawsuit, nor does any claim involve a customer dispute. At issue is Defendants' conduct towards Gallagher and their unlawful reliance and use of Gallagher's confidential information to steal Gallagher's customers in violation of the Individual Defendants' employment contracts and Virginia statutory and common law.

Finally, Defendants move to dismiss some of Gallagher's claims in part. While Gallagher respectfully disagrees with the Court's ruling on the likelihood of success of an action based on the Individual Defendants' non-solicitation restrictive covenants, Gallagher's breach counts survive independently of those restrictive covenants. Indeed, Defendants offer no argument that Gallagher fails to state a claim for breach of the confidentiality or notice provisions in the Individual Defendants' employment agreements. As pled (and as Defendants have admitted in

sworn declarations), GWM was an active and knowing participant in the scheme to misappropriate Gallagher's confidential information and steal Gallagher's customers. GWM was aware of Individual Defendants' contractual obligations and was actively involved in efforts to subvert them. Contrary to Defendants' assertions, their conduct, as alleged, goes far beyond mere contact with a potential employer. For all these reasons and as more fully set forth below, the Court should deny Defendants' motion.

## RELEVANT BACKGROUND

Gallagher provides retirement account services for clients with retirement accounts such as traditional, rollover, and beneficiary IRAs. FAC ¶ 20–21. Gallagher is not a broker-dealer and instead assists clients in connecting with an outside broker-dealer, Osaic, where clients can hold annuities and other non-retirement investment accounts. *Id.* ¶ 21. Individual Defendants joined Gallagher in November 2022, in connection with Gallagher's acquisition of f3Logic, LLC, f3Investment Management, LLC, and other related entities ("F3"). *Id.* ¶ 18. Gallagher paid significant consideration to acquire F3, including all F3 client accounts representing hundreds of millions of dollars in assets under management ("AUM"), all F3 customer goodwill, and all F3 confidential information. *Id.* Following this acquisition, Gallagher assigned the Individual Defendants to much of the acquired business. *Id.* ¶ 19. While Gallagher expected Individual Defendants to originate additional business at Gallagher in addition to servicing acquired F3 accounts, Markfeld generally did not originate additional business at Gallagher. *Id.* The clients Geary originated were obtained through the use of Gallagher's resources and proprietary information. *Id.*

Investment advisor employees like Individual Defendants are client facing, requiring significant review, and reliance on Gallagher's confidential business information for client

development and servicing needs. *Id.* ¶ 22. In particular, investment advisors have access to Gallagher's confidential customer relationship management (CRM) database, Redtail. *Id.* This confidential information includes, *inter alia*, client-specific information, including risk tolerance and preferences, AUM, net worth information, banking information, contact and family information, advisory fee rates, and other information identified in Markfeld and Geary's Employee Agreements. *Id.* ¶ 23; ECF Nos. 59-1, 59-2 (the "Employment Agreements").

Individual Defendants left Gallagher and immediately went to work for GWM in early October 2025. FAC ¶ 44. Their Employment Agreements prohibit the solicitation of Gallagher customers whom Individual Defendants serviced in the two years before the end of their employment. *Id*. ¶¶ 28–29; ECF Nos. 59-1 and 59-2 §§ 7–8. The Employment Agreements also govern Individual Defendants' access to confidential information and require that Individual Defendants not use or disclose such information other than in connection with their work for Gallagher. *Id*. ¶¶ 31–37; ECF Nos. 59-1 and 59-2 § 6. The Employment Agreements also provide for 21-day notice periods upon resignation, during which time, Individual Defendants agreed to continue working exclusively for Gallagher's benefit and cooperate in the transfer to other Company employees of the accounts for which they were responsible. *Id*. ¶ 43; ECF Nos. 59-1 and 59-2 §5.

Since at least July 2025, GWM had been in contact with Individual Defendants and another former Gallagher employee, Holly Mayberry, regarding Individual Defendants and Mayberry coming to work for GWM. *Id.* ¶¶ 52–53. During that time and while still employed at Gallagher, Individual Defendants began accessing Gallagher's confidential customer information in order to use that information to wrongfully solicit Gallagher's clients to GWM. *Id.* Forensic review of Mayberry's computer reveals communications with GWM about a tuck-in acquisition, that is, a

plan to misappropriate all the accounts Markfeld and Geary previously served while employed for Gallagher for GWM's benefit. *Id.* ¶¶ 6, 53. As part of the Defendants' plan, in the days leading up to their resignation, Markfeld and Geary printed Gallagher confidential customer information including the names and contacts of customers and their AUM, and including a file titled "Client account report – Name, Age, client since, AUM portfolio value.csv." *Id.* Markfeld likewise extensively accessed Gallagher's Redtail customer database between late July and early October 2025, searching for hundreds of Gallagher customer names while searching for a fraction of those names on spokeo.com and whitepages.com. *Id.*[2]

Mayberry resigned on September 26, 2025, shortly before the Individual Defendants. *Id.* ¶ 46. Although Mayberry falsely told Gallagher that she was resigning based on her husband's new job and no longer needed her income, in reality she began working at GWM upon the end of her employment. *Id.* ¶¶ 46–47. Geary would later inform Gallagher that Mayberry was joining GWM, apparently in anticipation of Markfeld and Geary's resignations. *Id.* ¶ 48. Markfeld told Gallagher that he had coached Mayberry on how to resign from Gallagher without raising suspicion. *Id.* ¶ 49. Mayberry's early departure was part of a scheme between Individual Defendants, Mayberry, and GWM to lay the groundwork for Defendants' subsequent solicitation of Gallagher's customers as evident from Defendants' successful solicitation of many clients within 24 hours of Individual Defendants' departures from Gallagher. *Id.* ¶¶ 50–51.

On October 6, 2025, Individual Defendants resigned from Gallagher, triggering the 21-day notice period under their Employment Agreements, during which they continued to owe fiduciary duties to Gallagher and remained under obligations not to use Gallagher's confidential information

---

[2] Markfeld has admitted that he did so to determine the feasibility of his scheme to copy Gallagher's confidential customer information. ECF No. 44-1 ¶ 13.

for their benefit or the benefit of another. *Id.* ¶¶ 54–57. Individual Defendants instead immediately went to work at GWM, and during those 21-days, Individual Defendants worked with GWM to systematically contact and solicit hundreds of Gallagher clients whom Individual Defendants had previously serviced, prioritizing those with the highest AUM, who left Gallagher first. *Id.* ¶¶ 57–64. In doing so, Markfeld and Geary relied on client lists and other Gallagher confidential information, such as client spreadsheets they printed out prior to their resignation and Redtail customer database reports. *Id.* ¶ 65. Despite servicing approximately 750 accounts at Gallagher, Defendants appear to have names and contact information for virtually all the client accounts they serviced while at Gallagher. *Id.* GWM in turn has encouraged and expected Markfeld and Geary's breaches of their Employment Agreements and fiduciary duties, even advertising the amount of assets they expected Individual Defendants to bring with them from Gallagher. *Id.* ¶ 66.

## LEGAL STANDARD

Rule 12(b)(1) provides for the dismissal of a cause of action based on a court's lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "A motion to dismiss for lack of subject matter jurisdiction challenges the court's authority to hear the matter brought by the complaint." *Richardson v. Caring Hands & Supplementary Enrichment Educ., LLC of Virginia*, No. 2:24cv588, 2025 WL 1115747, at *2 (E.D. Va. Apr. 15, 2025) (cleaned up). Dismissal under Rule 12(b)(1) is appropriate only when the jurisdictional allegations are "clearly immaterial, made solely for the purpose of obtaining jurisdiction or where such a claim is wholly unsubstantial and frivolous." *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009). The burden is on the party asserting jurisdiction to demonstrate that jurisdiction exists. *See Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999).

Standing pertains to whether a party has a "sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy." *Sierra Club v. Morton*, 405 U.S. 727, 731–32 (1972). To establish standing, a plaintiff must show it "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The injury in fact must be concrete and particularized. *Id.* at 334. In a facial challenge, a "defendant contends that the complaint 'fails to allege facts upon which [standing] can be based." *Wikimedia Found, v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017). Under a facial challenge, a court is required to accept all of the complaint's factual allegations as true, and plaintiffs are afforded the same procedural protection they would receive under 12(b)(6) consideration. *Kuntze v. Josh Enterprises, Inc.*, 365 F. Supp. 3d 630, 636 (E.D. Va. 2019). Under a factual challenge, where the defendant contends jurisdictional allegations are not true, a court "may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings." *Kuntze*, 365 F. Supp. 3d at 636.

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). Rule 8 requires that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up). To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing

*Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Labels and conclusions," a "formulaic recitation of the elements," and "naked assertions" without factual enhancement are insufficient. *Id.* The burden lies with the moving party to show entitlement to dismissal. *Ziegler v. Dunn*, No. 3:23cv480 (RCY), 2024 WL 761860, at *2 (E.D. Va. Feb. 23, 2024) (Citing Wright, Miller & Spencer § 1357).

## ARGUMENT

### 1. FINRA arbitration rules are inapplicable and do not divest the Court of jurisdiction.

Defendants argue that Gallagher lacks subject matter jurisdiction due to FINRA's arbitration requirements, notwithstanding the fact that those requirements are inapplicable and non-jurisdictional. Nor can Defendants identify any agreement to arbitrate that is binding on Gallagher.

#### a. Arbitration rules have no bearing on this Court's subject matter jurisdiction.

As an initial matter, and fatal to Defendants' challenge to subject matter jurisdiction, Defendants do not identify any legal authority by which FINRA, a self-regulatory organization under the oversight of the SEC responsible for supervising its *member firms*,[3] can divest a federal court of its subject matter jurisdiction over disputes by non-members. Gallagher is not a FINRA member and its claims do not involve customer disputes.

Moreover, "the [Federal Arbitration Act] does not divest federal courts of otherwise-possessed subject matter jurisdiction over disputes subject to arbitration agreements." *Colonial River Wealth Advisors, LLC v. Cambridge Inv. Rsch., Inc.*, No. 3:22cv717 (RCY), 2023 WL 4708086, at *4 (E.D. Va. July 24, 2023) (addressing a 12(b)(1) motion based on FINRA arbitration

---

[3] *See* https://www.finra.org/about.

requirements). Indeed, "the proper vehicle for asserting an arbitration requirement would be a motion to compel arbitration, not an attack on subject matter jurisdiction." *West v. Merillat Indus., Inc.*, 92 F. Supp. 2d 558, 561 (W.D. Va. 2000). Unlike *Colonial River*, which concerned a contractual arbitration clause, *see* 2023 WL 4708086, at *6, there is no arbitration requirement in the Employment Agreements at issue here.[4] Thus, Defendants do not raise a bona fide challenge to this Court's subject matter jurisdiction.

**b. Gallagher has not consented to arbitration.**

Defendants' broader argument for arbitration fails as Gallagher never agreed to arbitrate the claims in this case, either through membership in FINRA or a contract. Instead, Defendants misconstrue FINRA Rule 12200, which requires arbitration between FINRA members and their customers, to somehow require arbitration between non-FINRA members like Gallagher and employee non-customers like Individual Defendants.[5]

Defendants argue "that FINRA arbitration services are for disputes arising out of the business activities of a brokerage firm or one of its brokers." Motion at 7. Yet, it is undisputed that Gallagher is not a broker-dealer or FINRA member. *Id.* at 1. Due to this fact, Individual Defendants did not and could not act as brokers for Gallagher. Defendants' reliance on FINRA Rule 12200 is misplaced, as evidenced by the rule itself, which requires *inter alia* that "[t]he dispute is between

[4] While this Court in *Colonial River* ultimately enforced arbitration against a non-signatory, it did so on equitable estoppel grounds because the party and its principal had previously arbitrated in FINRA many of the claims at issue in the suit, thus seeking to claim the benefits of such arbitration while later attempting to avoid arbitration by filing suit. *See* 2023 WL 4708086, at *9. Here, there is no arbitration agreement at issue, and Gallagher has not availed itself of any arbitration procedures. Defendants do not assert equitable estoppel, nor are there grounds for compelling arbitration on that basis.

[5] Defendants also make passing reference to FINRA Rule 13200, which is similarly inapplicable. As Defendants readily admit, Gallagher is not a broker-dealer and not subject to FINRA's jurisdiction. Motion at 11. Gallagher likewise does not and cannot provide brokerage services through its employees. Therefore, Rule 13200 does not apply.

a customer and a member or associated person of a member." *Id.* at 9. No customer is party to this action, and no party seeks damages or injunctive relief against any customer or vice versa. No customer has requested arbitration, and Defendants do not explain how any customer would have standing to challenge the employment contracts or fiduciary duties among Gallagher and its employees like the Individual Defendants.

Absent any evidence of Gallagher's consent to arbitrate, either by virtue of membership in FINRA or a contractual agreement, Defendants' argument for arbitration is meritless. In FINRA cases and otherwise, "[a]rbitration is a matter of consent, not coercion and federal arbitration policy does not alter that maxim." *Raymond James Fin. Servs., Inc. v. Cary*, 709 F.3d 382, 385 (4th Cir. 2013) (citing *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 479 (1989)) (cleaned up). The "touchstones of arbitrability analysis are the twin pillars of the parties' consent and intent to arbitrate" *Id.* at 385–86 (cleaned up). Under Rule 12200, when a company becomes a member of FINRA, it "agree[s] to mandatory arbitration of specified disputes *with customers* when the customer 'requests' such arbitration." *UBS Fin. Servs., Inc. v. Carilion Clinic*, 706 F.3d 319, 324 (4th Cir. 2013) (emphasis added). Setting aside the fact that this obviously is not a dispute between a customer and a FINRA member, Gallagher, a non-member of FINRA, neither agreed to mandatory arbitration by becoming a member nor executed any other agreement to submit its employee contract disputes to mandatory arbitration. Simply put, FINRA's jurisdiction is limited. "FINRA has the authority to create and enforce rules *for its members* to provide 'regulatory oversight of all securities firms that do business with the public.'" *Morgan Keegan & Co. v. Silverman*, 706 F.3d 562, 563 (4th Cir. 2013) (citing SEC Rel. No. 34–56145, 72 Fed. Reg. 42169, 42170 (July 26, 2007) (emphasis added).

Defendants cite the Individual Defendants' Employment Agreements but identify no agreement to arbitrate. The party seeking to compel arbitration based on an agreement between the parties bears the burden of establishing that an arbitration agreement exists applying state law principles of contract. *Kiser v. Truist Fin. Corp.*, 796 F. Supp. 3d 207, 219 (E.D. Va. 2025). Defendants do not contend that the Employment Agreements themselves contain arbitration agreements, just that FINRA regulations might apply "to certain kinds of claims." Motion at 9. That is a far cry from establishing that FINRA regulations actually apply to *these claims*. In reality, the Employment Agreements merely contain an exception "as may otherwise be required by applicable law, rule or regulation (including FINRA regulations)." ECF Nos 59-1 and 59-2 at § 12. Indeed, Defendants readily concede "[Gallagher] is not a broker-dealer and itself not directly subject to FINRA's jurisdiction." Motion at 11. The alleged "end run" around FINRA that Defendants reference is nothing of the sort. *Id.* at 1. Rather, FINRA rules simply do not apply to this dispute. Defendants nevertheless seek to reshape the entirety of federal arbitration policy by compelling arbitration without Gallagher's intent or consent to submit these claims to arbitration.

**2. Gallagher has standing to bring claims related to its own contracts and the fiduciary duties it is owed.**

Defendants also make a bizarre challenge Gallagher's standing to bring its claims. Gallagher's Amended Complaint states claims for Breach of Contract (Counts I and II), Tortious Interference with Contract (Count III), Breach of Fiduciary Duty of Loyalty (Counts IV and V), Aiding and Abetting Breach of Fiduciary Duty of Loyalty (Count VI) and Conspiracy to Injure Trade and Business under Va. Code §§ 18.2-499–500 (Count VII). It is unquestionable that Gallagher has a personal stake in each of these causes of action. Gallagher is a party to the Employment Agreements (Counts I, II, and III), Gallagher is the employer to whom Individual Defendants owed fiduciary duties (Counts IV, V, and VI), and Gallagher is the business

Defendants conspired to injure (Count VII). As a result of Defendants' actions, Gallagher has lost revenue, customers, customer goodwill, and control of its confidential information, all of which are cognizable harms, redressable through injunctive or monetary relief, as Gallagher has pled. Gallagher has not brought any claims on behalf of Osaic or any of Osaic's customers or based on any agreements or obligations Individual Defendants held with Osaic. *See* Motion at 12–13. Despite Defendants' contention, Gallagher is not limited to "recoup[ing] any recovery awarded to" Osaic. *Id.* On the contrary, Gallagher has standing to assert claims based on Defendants' conduct, including Individual Defendants' actions in violation of their Employment Agreements with and fiduciary duties owed to Gallagher.[6] Defendants' standing arguments based on FINRA jurisdiction similarly fail, as Gallagher is not subject to any arbitration agreement, and arbitration requirements do not divest courts of subject matter jurisdiction. *See Colonial River Wealth Advisors, LLC*, 2023 WL 4708086, at *4.

**3. Gallagher states a claim for breach of contract (Counts I and II).**

Defendants appear to only partially move to dismiss Counts I and II for failure to state a claim, resting their argument entirely on this Court's ruling at the temporary restraining order stage that Gallagher was unlikely to succeed on the merits based on the enforceability of its non-solicitation restrictive covenants. Gallagher subsequently prevailed on its preliminary injunction motion based, in part, on the Employment Agreements' confidentiality and notice provisions. Thus, the enforceability of Gallagher's non-solicitation provisions in Section 7 of the Employment Agreements is not dispositive as to Counts I or II, which also state valid claims for breaches based on the confidentiality and notice provisions in Sections 5 and 6 of the Employment Agreements

[6] Defendants cannot apply FINRA's requirement that customers submit their disputes with members to FINRA arbitration to non-members, particularly where, as here, the dispute does not involve customer claims at all.

stemming from the Individual Defendants' improper use and reliance of Gallagher's confidential customer information and actions taken during the 21-day notice and cooperation period owed to Gallagher. *See* FAC ¶¶ 52–58, 79–80, 91–92. Consequently, Defendants do not argue that Gallagher fails to state *any* claim for breach of contract, but they ask this Court to *prematurely* and unnecessarily excise certain claims—specifically, the non-solicitation restrictive covenants in Section 7 of the Employment Agreement—from valid breach claims in Counts I and II.

As the Supreme Court of Virginia has made clear with respect to demurrers (and as applied to its Rule 12(b)(6) analog here), such initial pleading challenges to restrictive covenants "cannot be used to decide on the merits whether a restraint on competition is enforceable" and such a ruling would "incorrectly short-circuit[] litigation pretrial and decide[] the dispute without permitting the parties to reach a trial on the merits." *Assurance Data, Inc. v. Malyevac*, 747 S.E.2d 804, 805 (Va. 2013). That same rationale holds even more true in this matter, where applied to the Court's preliminary, predictive ruling on Gallagher's motion for a temporary restraining order on Gallagher's non-solicitation covenants in Section 7. *See, e.g. Lackey v. Stinnie*, 604 U.S. 192, 207 (2025) ("A preliminary injunction, which temporarily preserves the parties' litigating positions based in part on a prediction of the likelihood of success on the merits, does not render a plaintiff a prevailing party.")

In *Assurance Data*, the trial court concluded on demurrer that non-compete and non-solicitation provisions were overbroad and thus unenforceable without affording plaintiff an opportunity to pursue discovery or present evidence to meet that burden. *Id.* at 807. Under Virginia law, "an agreement that restrains competition must be evaluated on its own merits, balancing the provisions of the contract with the circumstances of the businesses and employees involved." *Id.* at 808 (cleaned up). Restraints on competition "are neither enforceable nor unenforceable in a

factual vacuum" and "[a]n employer may prove a seemingly overbroad restraint to be reasonable under the particular circumstances of the case." *Id.* The trial court in *Assurance Data* thus committed reversable error in ruling on the merits of an agreement's enforceability without permitting plaintiff "to present evidence to demonstrate that the restraints are no greater than necessary to protect its legitimate business interests, are not unduly harsh or oppressive in curtailing [defendant's] ability to earn a livelihood, and are reasonable in light of sound public policy." *Id.* at 809.

Defendants make the same facial attack that is prohibited under *Assurance Data*, arguing that "there is no imaginable fact that could render a prohibition on 'accepting' and 'handling' the business of clients that contact the Individual Defendants enforceable."[7] Motion at 15. Defendants

[7] In addition to facial challenges being inappropriate at the Motion to Dismiss stage, Defendants are incorrect that such covenants are facially invalid, particularly where, as here, they impose distinct duties on the Individual Defendants. *See GMS Indus. Supply, Inc. v. G & S Supply, LLC*, 441 F. Supp. 3d 221, 228 (E.D. Va. 2020). This Court has granted a temporary restraining order prohibiting a defendant from "servicing clients that he serviced during his employment with [plaintiff]," ruling that such relief balanced the equities by protecting Plaintiff's interests without unduly restricting defendants' business interests. *M Corp v. Infinitive, Inc.*, No. 1:24cv1823 (RDA/IDD), 2024 WL 4696132, at *8 (E.D. Va. Nov. 6, 2024). It has likewise upheld a restrictive covenant prohibiting an employee from "solicit[ing] or provid[ing] services to, or sell[ing] products to" former business accounts. *Brillient Corp. v. RELI Grp., Inc.*, No. 1:24-CV-1205 (RDA/WBP), 2025 WL 864280, at *3 (E.D. Va. Mar. 19, 2025). The Supreme Court of Virginia has likewise upheld restrictive covenants prohibiting a former partner from "perform[ing] or offer[ing] to perform services for any client of the partnership." *Foti v. Cook*, 263 S.E.2d 430, 433 (Va. 1980). Virginia law also enforces restrictive covenants prohibiting a party from "accepting business" from any of the former employer's customers. *Solentus, Inc. v. Lam*, No. CL-2016-3462, 2017 WL 9833483, at *5 (Va. Cir. Ct. May 4, 2017*), judgment entered*, (Va. Cir. Ct. 2017). Virginia law further allows the enforcement of covenants not to compete. *See, e.g.*, *Update, Inc. v. Samilow*, 311 F. Supp. 3d 784, 786 (E.D. Va. 2018) (upholding a clause prohibiting the employee from one year from "directly or indirectly compet[ing] with Company by providing to another person or entity in competition with Company… the same or similar services as those that I provided to the Company during the term of my employment with Company"). Prohibitions on accepting or handling business from a particular subset of customers is inherently even more narrowly tailored than enforced covenants not to compete which prohibits the acceptance or handling of *any* customers within the competitive field.

rely only on *Power Home Solar, LLC*, a summary judgment decision which did not cite *Assurance Data* but instead rejected an argument that a company applies a restrictive covenant "far more narrowly than the actual wording demands"—in effect an attempt to replace the wording of a restrictive covenant with its application. As *Assurance Data* makes clear, however, Gallagher is entitled to the opportunity to later present evidence and argue—outside of a factual vacuum—that its non-solicitation restrictive covenants in Section 7 of the Employment Agreements are narrowly tailored to its particular business interests. *Assurance Data, Inc.*, 747 S.E.2d at 808. That is particularly true where Defendants extensively accessed and relied on Gallagher's confidential customer information. *See* FAC ¶¶ 52–53.[8] Defendants thus seek to short circuit a later fact-based determination as to the enforceability of Gallagher's non-solicitation restrictive covenant, asking this Court to disregard Virginia Supreme Court precedent and deny Gallagher the opportunity to pursue discovery and present evidence of the reasonableness of its restrictive covenants in Section 7 of the Employment Agreements.

**4. Gallagher states a claim for Tortious Interference with Contract (Count III).**

Defendants' argument against Gallagher's tortious interference claim similarly fails, as it both ignores the confidentiality and notice provisions in the Individual Defendants' Employment Agreements with which GWM interfered, and asks this Court to improperly and prematurely invalidate their non-solicitation covenants in a factual vacuum. Defendants argue that Gallagher "does not and cannot allege the existence of an enforceable contract . . . that GWM knew of those provisions or intentionally interfered or induced the Individual Defendants to breach or terminate their Employment Agreements with AJG." Motion at 16. Once again, Defendants make no argument that the Employment Agreements' confidentiality or notice provisions in Sections 5 and

[8] Defendants also admit that they accessed Gallagher's customer information for the purpose of later competing with Gallagher using that same information. *See* ECF No. 44-1 ¶ 13.

6 of the agreements are invalid or insufficient. *See* FAC ¶¶ 101–03. Thus, regardless of the enforceability of the Individual Defendants' non-solicitation obligations in Section 7, Gallagher alleges the existence of an enforceable contract.

Gallagher likewise sufficiently alleges that GWM had notice of the contracts at issue. In order to be liable for tortious interference, "the defendant must have actual knowledge of the existence of the business relationship or knowledge of facts that, upon reasonable inquiry, should lead to disclosure of the existence of the contract or potential business relationship." *Simbeck, Inc. v. Dodd-Sisk Whitlock Corp.*, 44 Va. Cir. 54 (1997), *aff'd* 508 S.E.2d 601 (1999); *See also Tazewell Oil Co. v. United Virginia Bank/Crestar Bank*, 413 S.E.2d 611, 627 (Va. 1992) (Whiting, J., concurring in part and dissenting in part) (concurring that jury instructions were proper because "constructive knowledge of a contract may give rise to a claim for its tortious interference"). GWM had notice of the Employment Agreements, having recruited Markfeld and Geary during their employment with Gallagher, and as Markfeld and Geary were contractually required to disclose their contracts to GWM. *See* FAC ¶ 99; ECF Nos. 59-1 and 59-2 § 5. F.[9] GWM likewise was on actual notice following cease and desist letters from Gallagher during the Individual Defendants' 21-day notice period. FAC ¶ 57.[10]

As to GWM's intentional interference, Gallagher plainly alleges (and it is undisputed) that Markfeld and Geary accessed and downloaded reports from Gallagher's confidential Redtail customer database from late July through October 2025. *Id.* ¶¶ 52–53.[11] Communications with

---

[9] GWM likewise requested Individual Defendants to submit customer information derived from Gallagher's confidential Redtail database during their employment negotiations. *See* ECF No. 44-1 ¶ 12, ECF No. 44-2 ¶ 11.

[10] Gallagher also sent GWM a letter containing each of the Employment Agreements on October 21, 2025, during Markfeld and Geary's 21-day notice period. *See* ECF No. 12-7.

[11] *See also* ECF No. 44-1 ¶ 13. Defendants likewise admit that GWM devoted its own resources to their attempts to copy Gallagher's customer lists. ECF No. 44-1 ¶ 17, ECF No. 44-2 ¶ 14.

GWM reveal repeated references to a "Markfeld & Geary (Tuck-in_Non-Protocol)" during this period. *Id.* "A tuck-in acquisition involves a larger company completely absorbing another, usually smaller, company and integrating it into its own platform."[12] During Markfeld and Geary's 21-day notice beginning on October 6, GWM likewise aided Markfeld and Geary in soliciting hundreds of Gallagher's clients, in direct violation of their duties to transition those accounts to other Gallagher employees. FAC ¶¶ 56, 102. Moreover, GWM did so by relying on confidential Gallagher customer information Individual Defendants accessed and printed before their resignations. *Id.* at ¶¶ 53, 103.

Defendants seek to recast GWM's role in encouraging and inducing Individual Defendants to violate their confidentiality and notice provisions as merely "discussing prospective employment opportunities or offering employment." Motion p. 17. Not so. In reality, GWM encouraged Individual Defendants to access and disclose Gallagher's confidential Redtail information so that GWM could financially benefit from Individual Defendants' efforts to solicit them while still owing fiduciary duties to Gallagher. It is undisputed that GWM directed Individual Defendants to access Redtail customer information in order to negotiate their salary based on the amount of business they could potentially steal from their former employer.[13] GWM subsequently issued a press release bragging about the amount of business Individual Defendants would bring over to GWM from Gallagher. FAC ¶ 66. It is uncontested that Markfeld continued to access that information to determine the feasibility of copying Gallagher's customer lists using publicly available information.[14] And it is uncontested that, during the notice period, GWM aided Markfeld

---

[12] https://www.investopedia.com/terms/t/tuckinacquisition.asp
[13] ECF Nos. 44-1 ¶¶ 6, 12, 44-2 ¶¶ 6, 11.
[14] ECF No. 44-1 ¶ 13.

in copying the Gallagher customer list, and soliciting former customers during the notice period, when Markfeld still owed Gallagher fiduciary duties.[15]

**5. Gallagher states a claim for aiding and abetting a breach of fiduciary duties and business conspiracy (Counts VI and VII).**

Caselaw recognizes a cause of action in Virginia for aiding and abetting a breach of fiduciary duties. *See M Corp v. Infinitive, Inc.*, No. 1:24-CV-1823 (RDA/IDD), 2024 WL 4696132, at *5 (E.D. Va. Nov. 6, 2024) (Alston, J). In particular, GWM encouraged and abetted Markfeld and Geary's access to confidential client information and use of that information to compete with Gallagher while still subject to those fiduciary duties. FAC ¶ 53. Defendants attempt to distinguish *M Corp* with a subsequent decision by *M Corp*'s author, *Beacon Sales*, but it is unavailing. *Beacon Sales Acquisition, Inc. v. Cameron Ashley Bldg. Prods., Inc.,* No. 1:25-CV-1820 (RDA/WEF), 2025 WL 3721684, at *13 (E.D. Va. Dec. 23, 2025). There, the Court reaffirmed that claims for aiding and abetting breach of fiduciary duties are available where the defendant had "(1) actual knowledge of the underlying fiduciary duty and (2) actual knowledge of the breach of that fiduciary duty by the primary tortfeasor." *Id.* Here, unlike *Beacon Sales*, Defendants do not contest that Gallagher states a claim for Markfeld and Geary's breaches of their fiduciary duties. *See id.* (stating that Plaintiff failed to demonstrate defendants breached a fiduciary duty). In challenging this aiding and abetting claim, Defendants repeat their meritless argument that Gallagher is seeking to impose liability merely for switching employers. Again, in reality, Defendants misappropriated Gallagher's confidential information during their employment for the purpose of using that

[15] Markfeld and Geary admit to taking identical steps to copy Gallagher's customer lists and running searches for Gallagher's clients "[a]long with support staff with provided by FiNet," indicating not only GWM's direct involvement, but their coordinated scheme to solicit Gallagher's customers while still owing Gallagher fiduciary duties. *See* ECF Nos. 44-1 ¶ 17, 44-2 ¶ 14. Markfeld admits to initiating contact with roughly 65% of the clients who followed him to GWM. *See* ECF No. 44-1 ¶ 9. Geary admits to initiating contact with 22% of the clients who followed him to GWM. *See* ECF No. 44-2 ¶ 8.

information to solicit Gallagher's customers in violation of Individual Defendants' fiduciary duties and unlawfully benefit themselves and GWM. Individual Defendants remained subject to those duties for 21 days following their resignation and have a surviving fiduciary duty not to use Gallagher's confidential information against it. GWM communicated with Defendants about a tuck-in acquisition of Gallagher's clients during their employment and weeks before their announced resignation, induced them to access and disclose confidential information about customer accounts, and assisted them in soliciting those customers during their notice period. FAC ¶¶ 52–58. Not only are those allegations a far cry from the conclusory allegations in *Beacon Sales* (*See* 2025 WL 3721684, at *13 ("Upon information and belief, CABP caused the former Dealers Choice employees to breach their fiduciary duties and duties of loyalty to Dealers Choice by, among other misdeeds, acting in concert with CABP")), but they are corroborated by Individual Defendants' own sworn statements.

Defendants' motion with respect to the statutory business conspiracy claim in Count VII fails for the same reasons. A party states a claim for business conspiracy where it alleges (1) a combination of two or more persons for the purpose of willfully and maliciously injury plaintiff in his reputation, trade, business, or profession and (2) resulting damage to plaintiff. *Steele Est. of Steele v. Goodman*, No. 3:21cv573, 2022 WL 4274120, at *7 (E.D. Va. Sept. 15, 2022). As here, a party states a claim for business conspiracy where plaintiff identifies specific individuals, the purpose of the alleged conspiracy, how defendant(s) carried out the conspiracy, and the injury to plaintiff. *Id.* In *Steel*, the Court ruled that the conspiracy claim survived even though "the Court has serious doubts about the ultimate success of the plaintiffs' claims" *Id.* at *1. The Supreme Court of Virginia has held that tortious interference with contract constitutes the requisite "unlawful act" to proceed on a business conspiracy claim. *See Dunlap v. Cottman Transmission*

*Sys., LLC*, 754 S.E.2d 313, 319 (Va. 2014). It is likewise well-established that breaches of fiduciary duties similarly satisfy the unlawful act requirement. *Id.* (citing *CaterCorp, Inc. v. Catering Concepts, Inc.*, 431 S.E.2d 277, 280–81 (Va. 1993); *Simmons v. Miller*, 544 S.E.2d 666, 676–77 (Va. 2001); *Feddeman & Co., C.P.A., P.C. v. Langan Assocs., P.C.*, 530 S.E.2d 668, 675 (Va. 2000)). Business conspiracy does not require proof that the conspirators' primary and overriding purpose is to injure another, only that defendants acted "intentionally, purposefully, and without lawful justification." *Feddeman*, 530 S.E.2d at 674.

Here, Gallagher alleges a conspiracy between GWM, Markfeld, Geary, and Mayberry to unlawfully solicit virtually all of Gallagher's customers previously assigned to Markfeld and Geary by using and relying on Gallagher's confidential information in violation of their duties to Gallagher. *See* FAC ¶¶ 5, 52–53, 126. More specifically, Defendants and Mayberry discussed a "Tuck-in" acquisition of Gallagher's clients on August 25, 2025, prior to Individual Defendants' resignation. *Id.* ¶ 52. Following those communications, Markfeld and Geary began extensively accessing Gallagher's confidential customer information for the purpose of later using that same customer information to recruit customers on behalf of GWM. *Id.* ¶ 53. After their resignation and while still subject to fiduciary duties under their contractual notice obligations, Individual Defendants worked in concert with GWM to immediately start recruiting hundreds of Gallagher's clients to GWM. *Id.* ¶ 59. The unlawful solicitations resulted in substantial loss of business and harm to Gallagher. *Id.* ¶¶ 59–68. Unlike *Beacon Sales*, which does not appear to make any specific factual allegations, *see* 2025 WL 3721684, at *13, *supra*, Gallagher specifically alleges the participants (Markfeld, Geary, GWM, and Mayberry), the purpose (stealing Gallagher's customers), the means (by using and relying on Gallagher's confidential information in violation

of their contractual and fiduciary duties), and the harm (Gallagher's loss of customers). These alleged facts sufficiently state a claim for conspiracy under Va. Code § 18.2-499-500.

**CONCLUSION**

Based on the foregoing, Plaintiff Arthur J. Gallagher & Co. respectfully requests that the Court deny Defendants' Motion to Dismiss the First Amended Complaint.

Dated February 3, 2026

Respectfully submitted,

***/s/ Brandon H. Elledge***

Brandon H. Elledge (VSB No. 45349)
Robert J. Farlow (VSB No. 87507)
Christian B. Hecht (VSB No. 98220)
**HOLLAND & KNIGHT LLP**
1650 Tysons Boulevard, Suite 1700
Tysons, Virginia 22102
703.720.8600 telephone
703.720.8610 facsimile
brandon.elledge@hklaw.com
robert.farlow@hklaw.com
christian.hecht@hklaw.com

*Counsel for Plaintiff Arthur J. Gallagher & Co.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2026, I filed a true and correct copy of the foregoing with the Clerk of Court using the CM/ECF system, which will send an electronic notice of such filing to all counsel of record.

*/s/ Christian B. Hecht*
Christian B. Hecht (VSB No. 98220)

*Counsel for Plaintiff Arthur J. Gallagher & Co.*