IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| ARTHUR J. GALLAGHER & CO., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:25CV885 (RCY) |
| | ) | |
| ALAN MARKFELD, *et al.*, | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION**

This Opinion follows from the Court's November 13, 2025 hearing on Plaintiff Arthur J. Gallagher & Co.'s Motion for Temporary Restraining Order ("TRO") and Plaintiff's Motion for Preliminary Injunction (collectively "Motions for Injunctive Relief"), filed on October 29, 2025. At the hearing, the Court denied the pending TRO and denied the concurrent Motion for Preliminary Injunction to the extent it rested on certain restrictive covenant provisions in Plaintiff's non-solicitation agreement, which the Court determined to be unenforceable. This explanatory Memorandum Opinion is issued, as promised from the bench, to illuminate the basis for the Court's ruling with respect to the restrictive covenants.

**I. BACKGROUND**

Plaintiff Arthur J. Gallagher & Co. ("Plaintiff" or "Gallagher") is a firm providing wealth management services, including retirement, investment, and benefits consultation, to both individuals and companies. Mem. Supp. Mot. Prelim. Inj. 1 ("Mem. Supp."), ECF No. 12. Defendants Alan Markfeld ("Markfeld") and Christopher Geary ("Geary") (together, the "Individual Defendants") are former Gallagher employees who both joined the firm in or around November 2022, in connection with Gallagher's acquisition of f3Logic, LLC, f3Investment Management, LLC, and other related entities ("F3"). *Id.* at 1, 3. During their Gallagher tenure,

the Individual Defendants provided investment advisory services[1] to approximately 750 clients, all from the F3 acquisition, totaling approximately $250 million in assets under management ("AUM"). *Id.* at 3–4. Pursuant to these roles, the Individual Defendants had access to Gallagher's confidential client and business information. *Id.* at 1–2.

Upon joining Gallagher in November 2022, the Individual Defendants executed Employment Agreements that contained restrictive covenants prohibiting certain conduct, including soliciting, accepting or servicing Gallagher clients, misusing confidential information, and recruiting Gallagher employees. *Id.* at 4–5; *see also* Markfeld Employment Agreement ("Employment Agreement") §§ 6–7, ECF No. 12–3.[2] These restrictions apply to "'Protected Account[s]' or 'Prospective Account[s],'" which are defined in the Agreement to include only those clients with whom [the] Individual Defendants provided the above services and/or directly prospected, and/or about whom the Individual Defendants received Confidential Information (the 'Restricted Clients')." Mem. Supp. 5–6.[3] The Employment Agreement also contains a twenty-

---

[1] Separately, through their concurrent employment with Osaic Wealth, Inc. ("Osaic"), the Individual Defendants provided these same clients with brokerage services, because Gallager does not provide brokerage services and instead refers clients seeking such services to Osaic, which is a FINRA-regulated entity. Markfeld Decl. ¶ 4, ECF No. 21-1; Geary Decl. ¶ 4, ECF No. 21-2.

[2] Because the Individual Defendants' Employment Agreements are identical, the Court refers only to the Markfeld Employment Agreement from this point onwards. The Court provides more detail on the relevant provisions of the Employment Agreement *infra* subpart IV(A).

[3] Prospective and Protected Accounts are defined in the Employment Agreement as follows:

D. "Prospective Account" means any entity (other than a then-current Company Account but including former Company Accounts) with respect to which, at any time during the one (1) year period immediately preceding the Termination Date, Employee: (i) submitted or assisted in the submission of a presentation or proposal of any kind on behalf of the Company, (ii) had material contact or acquired Confidential Information as a result of or in connection with Employee's employment with the Company, or (iii) incurred travel and/or entertainment expenses that were reimbursed by the Company to Employee. The term "Prospective Account" does not include an account that is a customer of Employee's new employer (for the same type of Insurance Services and/or Benefit Services for which such customer was a Prospective Account) at the Termination Date.

E. "Protected Account" means any Company Account for which Employee managed or regularly serviced, and/or about which Employee received or accessed Confidential Information on

one-day Notice provision, requiring the Individual Defendants to give Gallagher three weeks' notice prior to resigning and to assist in transitioning their clients to another financial manager at Gallagher.  Employment Agreement § 5.

On October 6, 2025, after roughly three years with Gallagher, the Individual Defendants abruptly resigned without providing the notice required by the Employment Agreement.  Mem. Supp. 8.  Immediately thereafter, the Individual Defendants began working for Defendant Granite Wealth Management ("GWM"), a direct competitor of Gallagher.  *Id.* at 8.  Another Gallagher employee—an account manager who worked closely with both Individual Defendants—also resigned and shortly thereafter also began working for GWM.  *Id.* at 9.

Upon their departure from Gallagher, the Individual Defendants confirmed they were aware of their obligations to Gallagher and stated they would not solicit any client to leave Gallagher for GWM.  *Id.* at 10.  Despite this acknowledgement, however, the Individual Defendants began soliciting Restricted Clients as soon as they started at GWM.  *Id.*  As of November 12, 2025, Gallagher has lost 126 clients serviced by the Individual Defendants in the two years preceding their resignation.  2d Suppl. Lucke Decl. ¶ 5, ECF No. 32.  117 of the 126 clients have switched their accounts to GWM.  *Id.* ¶ 6.  At least fifteen Gallagher clients have reported that the Individual Defendants "repeatedly called them in an attempt to convince them to transfer their accounts" to GWM.  *Id.* ¶ 7.

In sum, Gallagher alleges that the Individual Defendants, both leading up to and following their resignations, breached the Employment Agreement in seven discrete ways:  (1) soliciting and diverting Restricted Clients; (2) accepting those clients for GWM; (3) servicing those clients for

---

behalf of the Company in the two (2)-year period immediately preceding Employee's Termination Date.

Employment Agreement §§ 8(D), (E).

GWM; (4) using or disclosing Gallagher's confidential information; (5) failing to provide the required notice in advance of their resignation and violating their duty of loyalty during that period; (6) soliciting a Gallagher employee to join them in their employment at GWM; and (7) retaining Gallagher's confidential materials post-resignation—all of which are acts expressly prohibited by the Employment Agreement. *See* Mem. Supp. 8–14. At issue presently are Plaintiff's claims and request for injunctive relief predicated on three specific restrictive covenants from the Employment Agreement: (1) non-solicitation, (2) non-service, and (3) non-acceptance (collectively, the "Restrictive Covenants").

## II. PROCEDURAL HISTORY

Plaintiff filed its Complaint on October 27, 2025. Compl., ECF No. 1. On October 29, 2025, Plaintiff filed the instant Motions for Injunctive Relief and a Memorandum in Support thereof with attendant affidavits. Defendants filed their Memorandum in Opposition on November 3, 2025, along with attendant affidavits. Mem. Opp'n, ECF No. 21. Plaintiff also filed a supplemental declaration on November 4, 2025. ECF No. 22.

On the same day, the Court held a hearing on Plaintiff's TRO Motion. At the hearing, the Court requested supplemental briefing on the following issue:

> Assuming at least one of the Restrictive Covenants at issue—including the non-solicitation, non-acceptance, and non-service covenants—are overbroad and therefore unenforceable, may the Court sever such unenforceable restraints and enforce any remaining covenants without running afoul of Virginia's prohibition on judicial reformation (or "blue penciling") of Restrictive Covenants?

Order, ECF No. 25. Plaintiff filed its supplemental brief responding to the Court's inquiry on November 7, 2025. Pl.'s Suppl. Br., ECF No. 26. Defendants filed their response on November 10, 2025. Defs.' Suppl. Resp., ECF No. 28. Plaintiff submitted a reply on November 11, 2025. Pl.'s Suppl. Reply, ECF No. 29, and a Second Supplemental Declaration on November 13, 2025,

ECF No. 32.  Thus, the parties fully briefed the issues and submitted affidavits on the enforceability of the Restrictive Covenants and the blue-pencil issue by the November 13, 2025 hearing.  During that proceeding, the Court considered the parties' respective filings and arguments[4] and ultimately denied Plaintiff's Motions for Injunctive Relief[5]—but only to the extent it relied on the enforcement of the Restrictive Covenants.  ECF No. 35; *see also* TRO Hr'g Tr. 18:16–18, ECF No. 36.

### III.  STANDARD OF REVIEW

"The standard for granting either a TRO or a preliminary injunction is the same."  *Moore v. Kempthorne*, 464 F. Supp. 2d 519, 525 (E.D. Va. 2006).  A party must demonstrate that (1) it is likely to succeed on the merits of its case; (2) it is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of the equities tips in its favor; and (4) an injunction would be in the public interest.  *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds by *Citizens United* v. *FEC*, 558 U.S. 310 (2010), reinstated in relevant part on remand, 607 F.3d 355 (4th Cir. 2010) (citing *Winter* v. *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).  The decision to grant or deny a TRO rests in the Court's sound discretion.  *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017).  "Notably a district court is entitled to deny preliminary injunctive relief on the failure of any single *Winter* factor, without fully evaluating the remaining factors."  *Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023).

---

[4]  "For purposes of a motion for preliminary injunction, the court may consider any testimony offered at a preliminary injunction hearing as well as declarations and affidavits submitted by the parties."  *Noble Supply Logistics, LLC v. Curry*, 705 F. Supp. 3d 583, 591 (W.D. Va. Dec. 7, 2023) (citing *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 725–26 (4th Cir. 2016)).

[5]  "Where a Court finds that a defendant has received notice of the application for restraining order, it may convert a TRO motion into a motion for preliminary injunction."  *Gen. Parts. Distrib., LLC v. St. Clair*, 2011 WL 6296746, at *3 (D. Md. Dec. 14, 2021).  Accordingly, the Court consolidated consideration of the pending TRO and Motion for Preliminary Injunction at the November 14, 2025 hearing.

## IV. DISCUSSION

For the reasons articulated herein, the Court finds that Plaintiff has not demonstrated a likelihood of success on the merits with respect to its breach of contract claims, as the present record does not sufficiently establish the enforceability of the Restrictive Covenants upon which those claims rely.

With respect to the first *Winter* factor, while the movant need not "establish a 'certainty of success'"—it "must make a clear showing that [it] is likely to succeed at trial." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (internal quotation and citations omitted). Plaintiff's request for injunctive relief—as relevant to this Memorandum Opinion—is grounded in its breach of contract claims against the Individual Defendants. *See* Mem. Supp. 12–26. Thus, in order to make the requisite "clear showing' that it is likely to succeed at trial, Plaintiff must satisfy the elements of a breach of contract action.

Under governing Virginia law, the elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to plaintiff; (2) the defendant's violation or breach of that obligation; (3) and injury or damage to the plaintiff caused by the breach of obligation. *Squire* v. *Virginia Hous. Dev. Auth.*, 758 S.E.2d 55, 60 (Va. 2014).[6] The Court's present inquiry—into whether Plaintiff has demonstrated a likelihood of success on the merits of its breach of contract claims—begins and ends with the question of whether the Restrictive Covenants are enforceable against the Individual Defendants. At this stage, the Court finds that they are not, and so Plaintiff fails to demonstrate a likelihood of success on the merits.

---

[6] The Agreement is "governed by and construed in accordance with the laws of the State in which Employee resides on the Effective Date." Employment Agreement § 12(C). It is uncontested that the Individual Defendants are and have been Virginia residents; therefore, Virginia law governs. *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007) ("Virginia law looks favorably upon choice of law clauses in a contract, giving them full effect except in unusual circumstances." (citing *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999))).

### A.  Relevant Provisions of the Employment Agreement

The Restrictive Covenants at issue are found in § 7(A)(i) of the Employment Agreement.

Notably, the three covenants are grouped together in a single clause:

> Non-Solicitation, Non-Acceptance, and Non-Service of Protected Accounts and Prospective Accounts.  In [exchange for certain consideration] . . .  Employee agrees to the following restrictive covenants, which Employee acknowledges and agrees are reasonably necessary and narrowly tailored to protect the Company's legitimate business interests: During Employee's employment and for a period of twenty-four (24) months following the Termination Date . . . for any reason whatsoever Employee shall not, directly or indirectly, solicit, divert, sell, refer, transfer, provide, place, handle, market, accept, aid, counsel or consult in the placement, renewal, discontinuance, or replacement of any [enumerated products and services].

Emp. Agmt. § 7(A)(i).  While none of the aforementioned verbs are explicitly defined, the

Employment Agreement provides four non-exhaustive illustrative examples of solicitation:

> B. For purposes of the covenants set forth in Section 7.A., direct or indirect "solicitation" of a Protected Account or Prospective Account will expressly include, but not be limited to, the following (which is not intended to be an exhaustive list of direct or indirect solicitation, but is meant to provide examples of certain reasonably anticipated scenarios):
>
> > (i) Sending of an announcement by Employee or Employee's new employer to any Protected Account or Prospective Account, the purpose of which is to communicate that Employee has either formed Employee's own business enterprise or joined an existing business enterprise that will offer products or services in any way competitive with the Company.
> >
> > (ii) Initiating a communication or contact by Employee or Employee's new employer with any Protected Account or Prospective Account for the purpose of notifying such Protected Account or Prospective Account that Employee has either formed Employee's own business enterprise or joined an existing business enterprise that will offer products or services in any way competitive with the Company.
> >
> > (iii) Communication or contact by Employee or Employee's new employer with any Protected Account or Prospective Account (if such new employer's communication with a Prospective Account was facilitated by Employee, directly or indirectly, or if Employee will or is intended to benefit, directly or indirectly, by such communication) if the communication in any way relates to Insurance Services and/or Benefit

7

> Services; provided, however, nothing herein is intended to limit communications or contacts that are unrelated to Insurance Services and/or Benefit Services.
>
> (iv) The facilitation by Employee, directly or indirectly, of any Protected Accounts' execution of a broker of record letter replacing the Company as its broker of record.

*Id.* § 7(B)(i)–(iv). Finally, the Employment Agreement contains a severability clause:

> G. Severability. To the extent that any of the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason, it is the intention of the Parties that such word, phrase, clause or sentence shall be modified or deleted by a court of competent jurisdiction so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws, and the balance of this Agreement will not be affected thereby, the balance being construed as severable and independent.

*Id.* § 12(G).

## B. Plaintiff Failed to Carry its Burden to Show that the Restrictive Covenants are Enforceable at this Stage

"In Virginia, non-compete clauses are disfavored restraints on trade." *Update, Inc. v. Samilow*, 311 F. Supp. 3d 784, 787 (E.D. Va. 2018). Thus, under Virginia law, a restrictive covenant found in an employment agreement is enforceable only if it "(1) is narrowly drawn to protect the employer's legitimate business interest,[7] (2) is not unduly burdensome on the employee's ability to earn a living, and (3) is not against public policy." *Assurance Data, Inc. v. Malyevac*, 747 S.E.2d 804, 808 (Va. 2013) (cleaned up) (collecting cases).

These factors turn on considerations such as the "function, geographic scope, and duration elements of the restriction[s]." *Id.* (quoting *Home Paramount Pest Ctrl. Cos. v. Shaffer*, 718 S.E.2d

---

[7] Plaintiff undoubtedly has a legitimate business interest "to protect itself from losing potential work to competitors through employees who leave the company and then compete against [plaintiff] using the business sensitive knowledge and contacts they acquired" as an employee." *Update, Inc.*, 311 F. Supp. 3d at 788 (collecting cases). The legitimacy of the business interest does not end the analysis, however, because the restrictive covenant must also be "reasonable in the sense that it is no greater than is necessary to protect" Plaintiff's legitimate business interest. *Id.* at 789.

762, 764 (E.D. Va. 2011)). "'We assess these elements together rather than as distinct inquiries,' and to be enforceable the agreement must be found reasonable as a whole." *Id.* (citing *Preferred Sys. Sols., Inc. v. GP Consulting, LLC*, 732 S.E.2d 676, 681 (Va. 2012)). Importantly, "restraints on competition are neither enforceable nor unenforceable in a factual vacuum." *Id.* at 808–09 (holding "the [trial] court erred by using a demurrer to decide, on the merits, the enforceability of the Agreement's non-compete and non-solicitation provisions"). Put differently, a restrictive covenant's validity (or invalidity) requires a fact-intensive inquiry, and courts must make their assessment "[b]ased on [the] evidence presented." *Id.* This legal framework anchors the Court's analysis when assessing whether Plaintiff has demonstrated a likelihood of success on the merits.[8]

For purposes of this analysis, the Court finds the Restrictive Covenants' two-year duration and client-specific national geographic scope, standing alone, to be sufficiently tailored to protect Plaintiff's legitimate business interests. With respect to duration, the two-year term is no longer than that found in restrictive covenants previously upheld by courts in this District, *see, e.g.*, *Hair Club for Men, LLC v. Ehson*, 2016 WL 4577019, at *5 (E.D. Va. Aug. 2016) (two years), and the Virginia Supreme Court, *see, e.g.*, *Roanoke Eng'g Sales Co. v. Rosenbaum*, 290 S.E.2d 882, 884

---

[8] Plaintiff is correct that, in light of *Assurance Data*, "[i]t is too early at this stage in the case to **finally, dispositively invalidate, strike, [or] sever a covenant**." TRO Hr'g Tr. 17:1-5 (emphasis added). But that principle must be understood in light of the procedural posture in *Assurance Data*. In that case, the trial court sustained a demurrer—effectively disposing of the case—after concluding, "as a matter of law," that the restrictive covenants were unenforceable. *Assurance Data*, 286 S.E.2d at 807 n.1. The Virginia Supreme Court found that ruling to be premature because the trial court reached its conclusion in a "factual vacuum." *Id.* at 808. Specifically, the Virginia Supreme Court reasoned that the lower court erred in resolving enforceability at the demurrer stage because the plaintiff had no opportunity to "present evidence to demonstrate that the restraints" were justified. *Id.* at 809.

The instant case presents no such circumstance: the Court makes no definitive ruling on enforceability at this juncture. Rather, it holds the injunction-seeking Plaintiff to its burden to demonstrate a likelihood of success on the merits—an approach consistent with that taken by Virginia courts. *See SanAir Tech. Lab, Inc. v. Burrington*, 91 Va. Cir. 206, 208 (Chesterfield Cnty. Cir. Ct. 2015) (holding plaintiff failed to demonstrate likelihood of success on the merits as to the enforceability of a non-compete agreement, notwithstanding *Assurance Data*); *see also Shenandoah Women's Healthcare, P.C. v. Scheidt*, 2016 Va. Cir. LEXIS 589, at *5–6 (Rockingham Cnty. Cir. Ct. Aug. 24, 2016) ("Plaintiff cannot establish at this stage of the proceedings that it is likely to succeed on the issue of whether the non-compete clause is actually enforceable."). While a further developed factual record may yield a different result, based on the current factual record, the Court is not persuaded that these seemingly overly broad restrictions are justified, for the reasons articulated herein.

9

(Va. 1982) (three years).[9] Further, the national scope of the Restrictive Covenants appears facially justified given Gallagher's national operations and its functional limitation insofar as the Covenants apply only with respect to Restricted Clients, ameliorating any concerns as to geographic reach.[10] *See Preferred Sys. Sols., Inc. v. GP Consulting, LLC*, 732 S.E.2d 676, 682 (Va. 2012) ("The lack of a specific geographic limitation is not fatal to the covenant because the noncompete clause is so narrowly drawn to this particular project and the handful of companies in direct competition."); *cf. Update, Inc.*, 311 F. Supp. 3d at 90 (finding the relevant "non-solicitation and non-compete clauses' geographic scope . . . reasonable because it [sic] covers on the territories in which plaintiff conducts business and in which defendant conducted business.") .

However, the enforceability inquiry does not end there. Even where a restrictive covenant protects a reasonable business interest and is limited in duration and scope, it must remain reasonable in function and consistent with public policy. At this juncture, Plaintiff has not shown that the Restrictive Covenants satisfy those requirements, for the reasons discussed below. The Court first addresses the non-service and non-acceptance covenants together before turning to the non-solicitation covenant.

---

[9] While neither case concerned the financial-management industry, the Court finds no reason, nor do Defendants cite any, why this duration poses unique issues in this industry.

[10] Defendants argue that the Restrictive Covenants are overbroad since they encompass Prospective Accounts. Mem. Opp'n. 15–16. But that term is not so far-reaching. Prospective Accounts include only those accounts the Individual Defendants had contact with or learned of through their employment with Gallagher, *see supra* n.3. Such reach is permissible. *See Blue Ridge Anesthesia & Critical Care, Inc. v. Gidick*, 239 Va. 369, 372 (1990) ("It is not necessary that the employees actually had acquired or possessed specific information that could be legally defined as confidential or a trade secret. Non-competition agreements are also justified where the employee comes into personal contact with his employer's customers." (cleaned up) (quoting *Paramount Termite Ctrl. v. Rector*, 380 S.E.2d 922, 925 (Va. 1989))).

## C.  Non-Service and Non-Acceptance Covenants.

The non-acceptance and non-service restrictions contained in Section 7(A) prohibit the Individual Defendants from accepting or servicing Restricted Clients for two years following their departure from Gallagher.  *See* Emp. Agmt. § 7(A)(i).  Plaintiff argues these covenants are enforceable, as Virginia courts have previously enforced restrictive covenants that, as here, prohibit former employees from servicing or accepting competing business from their former employer's clients.  Mem. Supp. 18.  Defendants, on the other hand, contend that the prohibition on servicing and accepting business from former clients renders this provision overbroad and runs contrary to both Virginia Law and FINRA Rule 2140.[11]  Mem. Opp'n 12–13.

The Court reads the non-acceptance and non-service restrictions to do exactly that—bar the Individual Defendants from accepting and servicing business from former clients.  As written, however, the prohibition applies even where the Restricted Clients—not the Individual Defendants—initiate the communication in an effort to continue receiving financial services from their preferred advisors.  In effect, the Employment Agreement curtails *the clients'* ability to act on their own preference—an approach courts in this District have repeatedly declined to enforce when considering injunctive relief requests in the wealth-management context, citing public policy concerns.  *See Bank of Am. Inv. Servs. v. Byrd*, 2009 WL 10184606, at *9 (E.D. Va. June 13, 2009) ("Clients should be free to deal with the broker of their choosing and not subjected to the turnover of their accounts to broker associated with the firm but unfamiliar to the client, unless the client gives informed consent to the turnover." (quoting *Prudential Securities, Inc. v. Plunkett*, 8 F. Supp

---

[11] The Parties dispute whether this matter must be arbitrated before FINRA.  Although Gallagher is not a FINRA member, Defendant argues that FINRA arbitration is nonetheless required because the Individual Defendants are FINRA-licensed brokers who provided FINRA-regulated brokerage services during their employment, and the Employment Agreements reach those client relationships.  Mem. Opp'n 9.  The Court need not resolve this dispute at this stage.  Even if FINRA ultimately governs, FINRA Rule 13804 permit parties to seek injunctive relief in court, rendering resolution of the arbitration issue unnecessary for purposes of the present Motions.

2d 514, 520 (E.D. Va. May 26, 1998))); *see also Variable Annuity Life Ins. Co. v. Coreth*, 535 F. Supp. 3d 488, 519 (E.D. Va. 2021) (noting that the requested injunctive relief did "not prevent clients from transferring accounts on their own accord and based on an informed choice"); *Wachovia Sec., LLC v. Gates*, 2008 WL 1803612, at *3 (E.D. Va. Apr. 21, 2008) ("Granting the relief requested by the plaintiffs would restrict those customers' choices, and thus would not serve the public interest."). Indeed, courts in this District have adhered to this principle even when granting injunctive relief for related misconduct, including trade-secret violations. *See Salomon & Ludwin, LLC v. Winters*, 741 F. Supp. 3d 398 (E.D. Va. 2024) (granting a narrow injunction barring only *proactive* solicitation while permitting defendants to continue servicing existing clients and to add new clients), *aff'd in relevant part*, 150 F.4th 268 (4th Cir. 2025).

This policy concern tracks FINRA Rule 2140, which prohibits interference with the transfer of customer accounts in the context of employment disputes. Given this shared policy rationale, the Court need not determine at this stage whether FINRA Rule 2140 directly governs the Employment Agreements; Virginia's public-policy analysis independently reflects the Rule's substance.

Plaintiff relies on *Solentus, Inc. v. Lam*, 95 Va. Cir. 428 (Fairfax Cnty. 2017), and *Brillient Corp. v. RELI Group, Inc.*, 2025 WL 864280 (E.D. Va. Mar. 19, 2025), to support the proposition that such sweeping non-service and non-acceptance provisions are enforceable. Mem. Supp. at 18. Those cases, however, arose in the defense-contractor context, not in the wealth-management industry, and therefore they do not implicate the same consumer-choice concerns. Extending those holdings here would contravene *Assurance Data*'s directive that restrictive covenants be evaluated on a case-by-case basis.

12

Defendants also compellingly posit that the Employment Agreement encompasses brokerage services not offered by Gallagher—but instead offered by Osaic—which further weighs against enforceability on the present record.  Mem. Opp'n 17 (representing that § 7(A)(i)(b) of the Employment Agreement encompasses services not offered by Gallagher); *see also* Defs.' Suppl. Resp. 6; *supra* n.1.  The Court finds Defendants' argument persuasive at this procedural posture. The fact that the Employment Agreement reaches services outside of Gallagher's wheelhouse further demonstrates the Restrictive Covenants' overbreadth.  *Compare Update, Inc.*, 311 F. Supp. 3d at 791 (finding scope of non-compete reasonable when it was "limited 'to the types of activities and services included within [defendant's] Job Description described in [his] offer letter'"), *with Home Paramount Pest Ctrl. Cos.*, 718 S.E.2d at 765 ("We have consistently assessed the function element of provisions that restrict competition by determining whether the prohibited activity is of the same type as that actually engaged in by the former employer."), *and Motion Control Sys. Inc. v. East*, 547 S.E.2d 424, 426 (Va. 2001) (affirming trial court's finding that a noncompete was unenforceable because it reached "a wide range of enterprises unrelated to the business of [the employer]").

In sum, a restrictive covenant that broadly prohibits former wealth-management employees from accepting or servicing clients who—entirely on their own initiative—seek out those former employees raises substantial concerns under Virginia's public-policy framework governing restrictive covenants.  Those concerns are compounded where, as here, the restriction encompasses categories of services outside the employer's own business operations.  Taken together, and notwithstanding these provisions' otherwise reasonable duration and geographic

scope, Plaintiff has not carried its burden at this stage to demonstrate a likelihood of success on the merits with respect to the enforceability of the non-acceptance and non-service covenants.[12]

**D.  The Non-Solicitation Covenant**

Having concluded that the non-acceptance and non-service covenants do not support injunctive relief, the Court turns to the non-solicitation covenant.  Because the Court concludes that the non-solicitation covenant is likewise overbroad, it need not reach the question of whether the provision may be severed from the unenforceable non-service and non-acceptance covenants.

1.  The Non-Solicitation Covenant is Overly Broad

The non-solicitation covenant's enforceability, like the other Restrictive Covenants discussed *supra*, turns on its functional operation.  Generally, non-solicitation covenants do not violate Virginia public policy in the same way as non-acceptance and non-service covenants. *Coreth*, 535 F. Supp. 3d at 519 (holding public policy favors the enforcement of a non-solicitation covenant where it "prevents the Former Advisors from violating valid confidentiality agreements with their employers and misappropriating trade secrets for personal gain").  This is especially true where, as here, the non-solicitation covenant does not likewise include a noncompete provision— meaning Individual Defendants remain free to work for GWM, or any other competitor, in Richmond, Virginia, or anywhere else. *See Blue Ridge Anesthesia*, 389 S.E.2d at 470 (finding restriction does not offend public policy where the industry was "a wide-open field with heavy competition, with multiple competing products").  Nonetheless, the non-solicitation covenant's scope must be narrowly tailored to protect the employer's legitimate business interests.

---

[12] Nor has Plaintiff persuaded the Court that enforcement of the non-acceptance and non-service provisions satisfies the public-interest or balance-of-equities factors under *Winter*.  Rather than targeting improper solicitation in a measured fashion, the provisions operate to impede autonomous client choice, a result courts in this District applying Virginia law have repeatedly viewed with skepticism in the wealth-management context.  Accordingly, without conclusively resolving the ultimate enforceability of the covenants, the Court concludes that the non-acceptance and non-service provisions do not support the issuance of injunctive relief at this stage.

In the instant matter, the parties expend great effort endeavoring to frame the Individual Defendants' post-employment communications with Gallagher's clients in the light most supportive of their respective positions.  Plaintiff argues that, at minimum, the Individual Defendants informally solicited Plaintiff's Restricted Clients in violation of the non-solicitation covenant.  Defendants counter that the Individual Defendants merely announced their employment change to Gallagher's clients without any actual solicitation, indirect, informal, or otherwise.  The Court need not ascertain whether such communications were in fact improper solicitations to resolve the instant motion because, even assuming Individual Defendants did impermissibly solicit Gallagher's clients, the restrictive covenant "fails even though it may be reasonable to the specific circumstances presented." *Lanmark Tech., Inc. v. Canales*, 454 F. Supp. 2d 524, 529 (E.D. Va. 2006).

Solicitation is not explicitly defined in the Employment Agreement.  Thus, the Court turns to § 7(B) of the Employment Agreement—which provides four non-exhaustive, illustrative examples of "solicitation"—to better understand the scope of activity covered by the non-solicitation covenant.  The first example of solicitation prohibits Individual Defendants from "sending . . . an announcement to any Restricted Account, the purpose of which is to communicate that Individual Defendant has either formed his own business enterprise or joined an existing business enterprise that will offer products or services in any way competitive with the Company." Emp. Agmt. § 7(B)(i).  The third example extends the restriction further, proscribing communication that "in any way relates to Insurance Services and/or Benefit Services[,]" while permitting communications unrelated to the same. *Id.* § 7(B)(iii).

Read together, these provisions prohibit Individual Defendants from notifying clients of their departure or subsequent professional plans, or from otherwise generally discussing Insurance

15

Services or Benefit Services—even if there is no actual solicitation. Such conduct bears little resemblance to solicitation as the term is ordinarily understood or specifically defined. *See* solicit, Merriam Webster, https://www.merriam-webster.com/dictionary/solicit (last visited November 7, 2025).

Indeed, as drafted, the non-solicitation covenant appears designed to prevent Individual Defendants from merely announcing their new employment, and the "majority rule" is that such announcements do not qualify as solicitation. *See Edward D. Jones & Co., L.P. v. Kerr*, 415 F. Supp. 3d 861, 873–74 (S.D. Ind. 2019) (collecting cases) ("We join this majority in holding that Mr. Kerr's announcement does not qualify as a solicitation where there is no evidence to show that Mr. Kerr did anything but inform his former clients of his new employment."); *see also, Byrd*, 2009 WL 10184606, at *2, *8 (finding plaintiff "failed to offer reliable evidence establishing that . . . Byrd . . . violated one, or both, non-solicitation clause(s)"—notwithstanding "Byrd admit[ting] to contacting his former clients . . . [because] he felt obligated to inform his clients of a material change in account relationship and provide contact information in case they needed to reach him," and otherwise determining, based on the defendants' having "raised at least some doubt as to the enforceability of the two non-solicitation clauses . . . as such clauses may be ambiguous and/or overbroad," that the defendants had not established a likelihood of success on the merits of their breach of non-solicitation clause claim). Consequently, even if Defendants did more than merely announce their changed employment, because the Employment Agreement reaches such solicitation **and** mere announcements, there is a significant possibility that it is rendered overly broad. *See Lanmark Tech., Inc.*, 454 F. Supp. 3d at 529 ("Thus, where a non-compete clause is ambiguous, that is, it is susceptible to two or more differing interpretations, one of which is

16

functionally overbroad, and thus unenforceable, **the clause fails even though it may be reasonable as applied to the specific circumstances presented**." (emphasis added)).

Moreover, "[t]he plain meaning of the word 'solicit' requires initiation of contact." *Mona Elec. Grp., Inc. v. Truland Servs. Corp.*, 56 F. App'x 108, 110 (4th Cir. 2003). But the first illustrative example does not require initiation of contact and instead is drafted to reach communications by the Individual Defendants whether or not in response to inquiries by Restricted Clients. Emp. Agmt. § 7(B)(i). This reading is reinforced by the second illustrative example, which largely mirrors the first example but more narrowly applies to communications "initiat[ed]" by Individual Defendants. *Id.* § 7(B)(ii). Thus, the non-solicitation covenant appears to reach conduct that is, in fact, not solicitation—further weighing against the non-solicitation's enforceability at this juncture.

This finding leads to the Court's next inquiry: whether it can sever or revise the illustrative examples to cure the covenant's overreaching scope without running afoul of Virginia's law proscribing judicial reformation, also known as "blue penciling." The Court concludes it cannot.

2.  <u>The Court Cannot Sever or Blue-Pencil the Non-Solicitation Covenant</u>

Under Virginia law, "courts may sever unenforceable provisions of an agreement, allowing enforcement of the surviving provisions, if the clauses impose distinct duties and the contract contains an enforceable severability clause." *Tactical Rehab., Inc. v. Youssef*, 2024 WL 4712696, at *16 (E.D. Va. Nov. 7, 2024) (citing *GMS Indus. Supply, Inc. v. G&S Supply, LLC*, 441 F. Supp. 3d 221, 228 (E.D. Va. 2020)). Courts may not, however, "'blue pencil'[13] or otherwise rewrite the contract" to eliminate illegal overbreadth. *Update, Inc.*, 311 F. Supp. 3d at 788 (quoting *Pais*

---

[13] "The 'blue pencil rule' permits a court to modify an otherwise unenforceable restriction to make it reasonable where it is clear from the terms of the agreement that it is severable. *Strategic Enter. Sols., Inc. v. Ikuma*, 77 Va. Cir. 179, 185 (Fairfax Cnty. Cir. Ct. 2008) (citing 61 A.L.R. 3d 397).

*v. Automation Prods.*, 36 Va. Cir. 230, 239 (Newport News Cir. Ct. 1995)). "The difference between 'blue penciling' and severing is a matter of focus. The former emphasizes deleting, and in some jurisdictions adding words in a particular clause. The latter emphasizes construing independent clauses independently." *Pitchford v. Oakwood Mobile Homes, Inc.*, 124 F. Supp. 2d 958, 966 (W.D. Va. 2000). "Examples of blue penciling a clause include 'limit[ing] . . . its application concerning its geographical area, its period of enforceability, [or] its scope of activity.'" *GMS Indus. Supply, Inc.*, 441 F. Supp 3d at 228 (quoting *W. Indus.-N., LLC v. Lessard*, 2012 WL 966028, at *3 (E.D. Va. Mar. 21, 2012)).

Applying the foregoing principles, the Court concludes that severance is not an available cure for the non-solicitation covenant, and neither can the Court blue-pencil the covenant so as to render it otherwise enforceable. Although the Employment Agreement contains a severability clause allowing for the removal of "any word, phrase, clause or sentence . . . found to be illegal or unenforceable for any reason," Emp. Agmt. § 12(G), the case law defining contractual language subject to severance requires there to be an "independent clause[]" "impos[ing] distinct duties," *Pitchford*, 124 F. Supp. 2d at 966; *Tactical Rehab., Inc.*, 2024 WL 4712696, at *15—such is not the case, here. Rather, to render the present non-solicitation covenant enforceable, the Court must excise or revise the illustrative examples of prohibited activity discussed *supra*. Put differently, the Court must engage in redefining the covenant's scope of activity—a textbook example of blue penciling. *GMS Indus. Supply, Inc.*, 441 F. Supp 3d at 228; *see also Better Living Components Inc. v. Coleman*, 67 Va. Cir. 221, 226 (Albemarle Cnty. Cir. Ct. 2005) ("There is a distinction between severing, where a *covenant* is excised entirely from the agreement, and 'blue penciling,' where the court rewrites invalid language to make it fit within the bounds of the law." (emphasis added)); *accord Lasership Inc. v. Watson*, 79 Va. Cir. 205, 217 (Fairfax Cnty. Cir. Ct. 2009)

18

("[T]his Court declines to exercise permissive authority granted by the parties in Paragraph 15 of the Employment Agreement to effectively 'blue-pencil' the restrictive covenants.").

Because the Court cannot engage in blue-penciling, and because there is no independent clause of the non-solicitation covenant otherwise subject to severance, the Court determines that the non-solicitation clause is likely unenforceable, and therefore Plaintiff has not demonstrated a likelihood of success on the merits of the associated breach of contract claim. As a result, injunctive relief based on such a claim is not available.

## V. CONCLUSION

Accordingly, for the foregoing reasons and as otherwise stated from the bench during the November 13, 2025 hearing, the Court denied Plaintiff's Motion for Injunctive Relief to the extent such relief was based upon the Individual Defendants' breach of the Restrictive Covenants. *See* ECF No. 34.

/s/
Roderick C. Young
United States District Judge

Date: July 29, 2026
Richmond, Virginia

19