IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| ARTHUR J. GALLAGHER & CO., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:25CV885 (RCY) |
| | ) | |
| ALAN MARKFELD, *et al.*, | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM OPINION**

This Opinion follows from the Court's December 11, 2025 hearing on Plaintiff's Motion for Preliminary Injunction, in which Plaintiff Arthur J. Gallagher & Company ("Plaintiff" or "Gallagher") seeks injunctive relief against Defendants Alan Markfeld ("Markfeld"), Chris Geary ("Geary") (together, the "Individual Defendants"), and Granite Wealth Management, LLC ("GWM") (all three collectively, "Defendants"). Specifically, Plaintiff requested that this Court promptly enjoin the Individual Defendants from soliciting or servicing clients whom they wrongfully solicited before and after their employment period ended through the use of and reliance on Gallagher's confidential information. From the bench, the Court granted in part and denied in part the Motion for Preliminary Injunction. The Court elaborates on the reasoning underpinning that decision, herein.

## I. BACKGROUND

### A. Factual Background[1]

This case concerns Defendants' alleged misuse of Gallagher's confidential information arising from their employment relationship, in violation of their fiduciary duty of loyalty—conduct

---

[1] "For purposes of a motion for preliminary injunction, the court may consider any testimony offered at a preliminary injunction hearing as well as declarations and affidavits submitted by the parties." *Noble Supply Logistics, LLC v. Curry*, 705 F. Supp. 3d 583, 591 (W.D. Va. Dec. 7, 2023) (citing *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 725–26 (4th Cir. 2016)).

that is analytically distinct from, and does not depend on, the enforceability of the non-solicitation, non-acceptance, or non-service covenants[2] in the Individual Defendants' employment agreements. Suppl. Mem. Supp. Prelim. Inj. ("Suppl. Mem. Supp.") 1, ECF No. 43.

Gallagher provides investment and wealth planning services to individuals and companies seeking retirement, investment, and benefits consultation. Mem. Supp. TRO & Prelim. Inj. ("Mem. Supp.") 1, ECF No. 12. The Individual Defendants are former Gallagher financial advisors who both joined the firm in or around November 2022, in connection with Gallagher's acquisition of f3Logic, LLC, f3Investment Management, LLC, and other related entities ("F3"). *Id.* at 3 (citing Vacarro Decl. ¶ 2, ECF No. 12-1). During their Gallagher tenure, the Individual Defendants were assigned to approximately 750 clients, all from the F3 acquisition. *Id.* (citing Vacarro Decl. ¶ 4). Because of their roles, the Individual Defendants had access to Gallagher's confidential client and business information.[3] *Id.* at 4 (citing Vacarro Decl. ¶ 6). Upon commencing their employment with Gallagher, the Individual Defendants executed Employee Agreements that, among other things, prohibited them from using or disclosing Gallagher's Confidential Information for their own benefit or the benefit of others, *id.* at 4–5 (citing Vacarro Decl. ¶ 8), and required a 21-day notice period before terminating their employment, *id.* at 8.

The Individual Defendants resigned without providing prior notice on October 6, 2025, and began working at GWM the very next day. Suppl. Mem. Supp. 3 (citing Markfeld Decl. ¶ 3,

---

[2] The Court previously observed that Plaintiff's request for injunctive relief was predicated in part on restrictive covenants the Court deemed unenforceable at this stage—a close question on the present record—and therefore concluded that Plaintiff had not demonstrated a likelihood of success on the merits of those claims. *See* ECF No. 35.

[3] "This confidential information includes but is not limited to: client-specific information, including risk tolerances and preferences, net worth information, banking information, contact and family information, advisory fee rates, and data relating to Gallagher's unique marketing and servicing programs, procedures and techniques; investment, wealth management and retirement plan consulting, variable annuities, investment business strategies, and other information as further identified and defined in each Employee Agreement (collectively, Gallagher's 'Confidential Information')." Markfeld Agreement 4, ECF No. 12-3; Geary Agreement 4, ECF No. 12-4.

ECF No. 21-1; Geary Decl. ¶ 3, ECF No. 21-2).  Relatedly, another Gallagher employee, Holly Mayberry ("Mayberry"), who worked closely with the Individual Defendants as an account manager and serviced many of the same clients, resigned from Gallagher to join GWM on September 26, 2025.  Mem. Supp. 9 (citing Vacarro Decl. ¶ 32).

Gallagher began losing clients previously serviced by the Individual Defendants to GWM the very next day, with its largest Assets under Management ("AUM") clients going first.  Suppl. Mem. Supp. 3 (citing Vacarro Decl. ¶ 40; Lucke Decl. ¶ 20, ECF No. 12-2).  Consequently, Gallagher initiated the instant action, alleging, *inter alia*, that the Individual Defendants improperly solicited these clients by misusing Gallagher's Confidential Information.  *See generally id.*

While many of Gallagher's allegations on this point originally relied primarily on information and belief, *see, e.g.*, Compl. ¶ 61, ECF No. 1, Gallagher subsequently conducted a forensic investigation in an effort to substantiate its claims, Mem. Supp. 7–10; *see also* Sun Decl. ¶¶ 9, 23–26, ECF No. 43-2.  This investigation, in Plaintiff's view, reveals that the Individual Defendants systematically extracted Plaintiff's protected client data—including client identities, AUM values, and account reports—from its proprietary database while still employed by downloading and printing "multiple books of business" and client account reports during the two months leading up to their abrupt resignations.  Suppl. Mem. Supp. 2–8.  Plaintiff provides forensic evidence to support its theory.  *Id.* at 7; *see also* Sun Decl.  Specifically, Plaintiff alleges its forensic investigation revealed the following:

- Markfeld and Geary began communicating with GWM as early as July 31, 2025, and had draft agreements with GWM as early as mid-August 2025;

- In the two months that followed, the Individual Defendants exported reports from Gallagher's Redtail database onto their company computers—which allowed them to

3

- identify a list of their former customers, contact information for those customers, and account financial information (i.e., Confidential Information);

- The Individual Defendants printed out various books of business and customer files from Gallagher's Richmond office printers between this same time period;

- Notably, on August 29, 2025—roughly five weeks prior to the Individual Defendants' resignations—Markfeld printed out a Redtail report, which included the confidential customer information of all of the 133[4] clients that have now joined Defendants at GWM;

- Starting on September 2, 2025, and continuing through October 3, 2025, Markfeld searched for and used client names in Gallagher's Redtail database in connection with searching for the same names on spokeo.com[5] and whitepages.com, which, in Plaintiff's view, was done to preemptively justify the Individual Defendants' sworn statements that they identified customer information through their own memory and/or publicly available means;

- In early October 2025, days before they stopped working for Gallagher on October 6, 2025, the Individual Defendants deleted their company computers' browser histories, and Markfeld deleted numerous files from his computer;

- In addition to printing various customer and Redtail files prior to their departure, Markfeld used a Google Docs platform, and both Individual Defendants routinely accessed personal email accounts from their company computers during this period—conduct that could have facilitated the transfer of exported Gallagher Redtail reports.

Suppl. Mem. Supp. 2–3 (citing Sun Decl. ¶¶ 9–26; Lucke Decl. ¶¶ 6–11).

---

[4] At the December 11, 2025 hearing on the instant motion, the Court learned that this number had since grown to more than 150.

[5] Spokeo.com is a people-search and data-aggregation website.

4

Plaintiff thus seeks injunctive relief to bar the Individual Defendants from (1) further misusing Plaintiff's confidential information to solicit clients and (2) servicing clients that have already transferred to GWM.

**B. Procedural Background**

Plaintiff filed its Complaint, ECF No. 1, on October 27, 2025. On October 29, 2025, Plaintiff moved for a Temporary Restraining Order ("TRO") and for a Preliminary Injunction and filed its supporting memorandum the same day. ECF Nos. 10, 11, 12. Defendants' counsel entered their Notices of Appearance on October 31, 2025. *See* ECF Nos. 17, 18. That same day, the Court set Plaintiff's TRO Motion for hearing on November 4, 2025. Order, ECF No. 19.

Following the initial hearing, the Court ordered supplemental briefing, which the Parties submitted between November 7 and November 11, 2025. ECF Nos. 26, 28, 29. After a second hearing on November 13, 2025, the Court denied the request for TRO and preliminary injunction[6] only to the extent that the relief sought by Plaintiff required the enforcement of its non-solicitation agreement; the Court directed the Parties to submit further briefing on issues related to the instant Motion. Subsequent briefing on the preliminary injunction was filed on November 24, December 2, and December 5, 2025, *see* ECF Nos. 43, 44, 45, and the Parties appeared before the undersigned for a hearing on the Preliminary Injunction on December 11, 2025. At the conclusion of that proceeding, the Court granted in part and denied in part Plaintiff's request for injunctive relief. This explanatory Memorandum Opinion follows.

---

[6] "Where a Court finds that a defendant has received notice of the application for restraining order, it may convert a TRO motion into a motion for preliminary injunction." *Gen. Parts. Distrib., LLC v. St. Clair*, 2011 U.S. Dist. LEXIS 145055, at *6 (D. Md. Dec. 14, 2021). Accordingly, the Court consolidated consideration of the pending TRO and Motion for Preliminary Injunction at the November 14, 2025 hearing.

## II.  LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citing *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013)).  The decision to grant or deny a motion for a preliminary injunction rests in the Court's sound discretion. *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017).  In considering such relief, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)).

Courts will not grant preliminary injunctive relief absent a showing (1) that the movant is likely to succeed on the merits; (2) that it is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor; and (4) that the requested relief is in the public interest. *Id.* at 20 (collecting cases).  Each of these so-called "*Winter* factors" must be satisfied, *Pashby*, 709 F.3d at 320–21, and the movant must "clearly establish entitlement to the relief sought," *Di Biase*, 872 F.3d at 230.

## III.  DISCUSSION

A review of the *Winter* factors establishes that Plaintiff has satisfied its burden for preliminary injunctive relief as to its breach of fiduciary duty of loyalty claims stemming from Individual Defendants' alleged misuse of Confidential Information, Counts IV and V.[7]

In Subsection A, the Court explains how Plaintiff satisfies the *Winter* factors with respect to these Counts.  In Subsection B, the Court concludes that a bond is warranted notwithstanding

---

[7] The Court's analysis therefore is limited to these counts, as "finding likelihood of success on only one claim is sufficient to justify injunctive relief." *Salomon & Ludwin, LLC v. Winters*, 150 F.4th 268, 273 n.1 (4th Cir. 2025).

Plaintiff's request to the contrary.  Finally, Subsection C explains why Plaintiff is not entitled to expedited discovery.

## A. Plaintiff Has Made the Requisite Showing for a Preliminary Injunction.

1. Likelihood of Success on the Merits

a. *Applicable Standard*

"To prevail on a breach of fiduciary duty [claim], a plaintiff must establish (1) the existence of a fiduciary duty; (2) a breach of that duty; and (3) subsequent damages attributable to the breach." *M Corp. v. Infinitive, Inc.*, 2024 U.S. Dist. LEXIS 202594, at \*13 (E.D. Va. Nov. 6, 2024) (internal quotes omitted).   Under Virginia law, employees unquestionably owe their employer a common-law fiduciary duty of loyalty throughout their period of employment.  *See, e.g.*, *Horne v. Holley*, 167 Va. 234, 241 (1936).  This duty bestows upon employees an obligation to not "misuse confidential information or solicit an employer's clients or other employees prior to termination of employment." *Feddeman & Co. v. Langan Assoc.*, 530 S.E.2d 668, 672 (Va. 2000) (cleaned up).[8]  Moreover, this duty continues "after the employment relationship has ended . . . under *limited* circumstances, such as when the former employee engages in business transactions founded on information gathered during his employment." *M Corp.*, 2024 U.S. Dist. LEXIS 202594, at \*13–14 (emphasis in original) (internal citation omitted).[9]

---

[8] Defendants argue that Counts IV and V do not allege misappropriation or use of Confidential Information and therefore cannot support injunctive relief on that basis, meaning Plaintiff is unlikely to succeed on the merits of those claims.  Resp. Opp'n Prelim. Inj. ("Resp. Opp'n") 7, ECF No. 44.  The Court finds this argument unavailing, as Plaintiff's breach of fiduciary duty of loyalty claims expressly encompass the misuse of an employer's confidential information.  Defendants' position therefore rests on a distinction that does not meaningfully exist.

[9] The Parties dispute whether the 21-day notice period applied following the Individual Defendants' resignations.  Plaintiff contends that it did, meaning that the Individual Defendants owed Gallagher a fiduciary duty through at least October 27, 2025.  Defendants counter that the notice period does not apply because the Individual Defendants resigned and Gallagher accepted those resignations, meaning the Individual Defendants owed Gallagher a fiduciary duty only through October 6, 2025.  However, the parties' dispute concerning the effective date of the resignations is relevant only if Plaintiff's breach of fiduciary duty theory depends on the continued existence of the employment relationship.  The Court concludes it does not: this case fits squarely within the "limited" category contemplated in *M Corp.*, in which an employee's fiduciary obligations to his employer extends beyond the end of the formal employment relationship due to the Individual Defendants utilizing confidential information that they

### b. *Misuse of Confidential Information to Compete with Employer*

The tension in cases where an employer seeks injunctive relief against a former employee based on allegations that the employee misused confidential information to impermissibly compete often turns on whether the employer can adduce facts sufficient for the Court to conclude that the employee in fact took and relied upon such information. *Compare M Corp.*, 2024 U.S. Dist. LEXIS 202594, *with Am. Conservative Union v. Inst. for Legis. Analysis*, 2025 U.S. Dist. LEXIS 27448 (E.D. Va. Feb. 13, 2025). That question is dispositive of whether Plaintiff is likely to succeed on the merits here.

In *M Corp.*, the court found a likelihood of success on the merits of a fiduciary duty of loyalty claim where the employee allegedly engaged in a sustained course of disloyal conduct during and after his employment. *Id.* at *14–15. Specifically, the employee was accused of disparaging his employer to customers and coworkers, actively soliciting the employer's customers while still employed, and abandoning efforts to secure contracts for ongoing projects. *Id.* After his departure, the employee allegedly continued to exploit his former employer's proprietary interests by accessing and using the employer's demo code to solicit customers, copying confidential information to a personal Google Drive account, and failing to maintain the secrecy of confidential, proprietary, and trade-secret information for his own benefit and that of a competitor. *Id.* Accordingly, the court found the employee's conduct—including his post-employment conduct—to be in violation of his fiduciary duty. *Id.* at *15; *see also Salomon &*

---

gathered during their Galagher tenure. 2024 U.S. Dist. LEXIS 202594, at *14; *see also Today Homes, Inc. v. Williams*, 634 S.E.2d 737, 744 (Va. 2006) ("Liability post-termination continues only for those transactions completed after termination of the officer's association with the corporation, but which began during the existence of the relationship or that were founded on information gained during the relationship." (internal citations omitted)). Simply put, even if Individual Defendants' employment ended on October 6, 2025, any misuse of Plaintiff's Confidential Information in the immediate days that followed may still constitute a breach of fiduciary duty where (as alleged here) the Confidential Information was acquired during the employment relationship.

*Ludwin, LLC v. Winters*, 741 F. Supp. 3d 398 (E.D. Va. 2024) (finding a likelihood of success on trade-secret misappropriation claims where former employees improperly used confidential customer information to solicit clients immediately after resigning), *aff'd in relevant part*, 150 F.4th 268 (4th Cir. 2025).[10]

Conversely, in *American Conservative Union*, the employer alleged that former employees breached their fiduciary duty by misappropriating confidential information to form a competing organization. *See* 2025 U.S. Dist. LEXIS 27448 at *22–25. In doing so, the plaintiffs relied only "upon information and belief." *Id.* at *22. The court held that the plaintiffs' allegations were "conclusory" because they did not "allege what information was obtained or taken, by which [d]efendant, or even what that information included." *Id.* at *24. Absent concrete allegations beyond lawful pre-resignation planning and post-employment competition, the court declined to infer misuse of confidential information and dismissed the fiduciary-duty claim for failure to plausibly allege a breach thereof. *Id.* at *24–25.

### c. Application: This Case is Sufficiently Similar to M Corp. and Salomon

The Individual Defendants' pre- and post-resignation conduct support the proposition that Plaintiff is likely to succeed on its breach of fiduciary duty of loyalty claims. Plaintiff's breach of fiduciary duty theory rests on its allegation that the Individual Defendants systematically extracted protected client data from Plaintiff's Redtail CRM while still employed—data including client

---

[10] In *Salomon*, the defendants (all financial advisors) founded their own wealth management firm six weeks prior to resigning. 741 F. Supp. 3d at 403. Immediately after their resignations, they began soliciting the plaintiff's "clients via text and voicemail and used [the p]laintiff's confidential client information in doing so." *Id.* As a result, the plaintiff "lost over 100 clients and over $300,000,000 in client assets." *Id.* The financial advisors admitted to taking client information with them. *Id.* at 405. This fact, coupled with the large volume of departing clients, was sufficient for the court to infer that the defendants removed and utilized the plaintiff's confidential information to solicit clients. *Id.* And while the court's analysis focused on trade-secret claims, it meaningfully engaged with the defendants' "breach of their duty to maintain secrecy"—grounded in their fiduciary duty of loyalty—crediting the plaintiff's argument that the defendants disclosed and used client information for the benefit of a competitor. *Id.* at 404–05. The Court finds this reasoning instructive here.

9

identities, AUM values, and account reports—by downloading and printing "multiple books of business" and client account reports during the two months leading up to their abrupt resignations. Suppl. Mem. Supp. 2–8.  Plaintiff provides forensic evidence to support its theory.  *Id.* at 7; *see also* Sun Decl., ECF No. 43-2.

Most notably, the forensic report reveals that (1) the Individual Defendants began communicating with GWM as early as July 31, 2025, and possessed draft employment agreements with GWM as early as mid-August 2025; (2) on August 29, 2025—approximately five weeks before his resignation—Markfeld printed out a Redtail report containing confidential customer information for all 133 clients[11] that later joined GWM; (3) between September 2, 2025, and October 3, 2025, Markfeld searched for clients' Confidential Information in Gallagher's Redtail database while simultaneously searching for the same information on public databases such as spokeo.com and whitepages.com; (4) both Individual Defendants routinely accessed personal email systems from their company computers—which Plaintiff states "could have allowed them to transfer the exported Gallagher Redtail reports;" and (5) in early October 2025, the Individual Defendants deleted their company computers' browser histories, and Markfeld deleted numerous files from his computer.

Further, another Gallagher employee, Mayberry, abruptly resigned on September 26, 2025, stating she no longer needed to work due to changed circumstances at home.  Mem. Supp. 9 (citing Lucke Decl. ¶ 13).  However, when the Individual Defendants resigned a few weeks later, they informed management at Gallagher that Mayberry was also joining GWM.  *Id.* (citing Lucke Decl. ¶ 12).  In Plaintiff's view, these facts—coupled with the immediate departure of at least 70

---

[11] Revised to 156 clients, as of the December 11, 2025 preliminary injunction hearing.

clients—is indicative of the Individual Defendants' misuse of Confidential Information to solicit clients.

Defendants do not challenge these facts. Instead, they push back on Plaintiff's inferences, offering alternative theories explaining their conduct. Specifically, Defendants counter that the Individual Defendants' printing/downloading of reports was done for one of three reasons: to "service their clients, comply with requests of Ms. Lucke, [or] to analyze their books of business for the purpose of evaluating future employment opportunities." Resp. Opp'n 8. Thus, in Defendants' view, Plaintiff's allegations to the contrary are "conclusory" and "pure speculation," rendering this case analogous to *American Conservative Union* and distinguishable from *M Corp*. *Id.* at 8–9.

The Court finds that the facts of this case are more analogous to *M Corp.* and *Salomon*, as the Individual Defendants engaged in coordinated pre-resignation conduct that, when considered alongside their near-immediate post-departure solicitation with Gallagher's clients, demonstrates that such pre-resignation activity was undertaken to extract and retain Gallagher's Confidential Information for competitive use. Although the conduct in *M Corp.* was more egregious, that case does not purport to define the minimum level of misconduct required to establish a likelihood of success. It merely provides one example of sufficient conduct. Likewise, although *Salomon* is ostensibly distinguishable since the defendants there admitted to taking confidential information after resigning, the circumstantial evidence here strongly supports the same inference—that the Individual Defendants took Gallagher's Confidential Information with them to compete against Gallagher. And, like *Salomon*, that conclusion is further reinforced by the mass departure of roughly 70 clients immediately following the Individual Defendants' resignations, with more to follow.

By contrast, the *American Conservative Union* case is readily distinguishable. There, the plaintiff failed to allege what confidential information was taken, by whom, or how it was used. Here, Plaintiff supplements its initial allegations with a detailed forensic investigation identifying the specific information accessed, downloaded, and printed.

Accordingly, the Court finds that the forensic evidence—combined with the immediate and substantial loss of Gallagher's clients—strongly supports the conclusion that the Individual Defendants took Gallagher's Confidential Information and relied upon it to solicit Gallagher's clients.

### d. Defendants' Proposition That They Relied on Memory is Unavailing

Defendants further argue that they did not take any Confidential Information with them but instead relied on their memory to hastily scribe clients' information on a legal pad once they left Gallagher[12]—conduct they contend aligns with *Peace v. Conway*, 435 S.E.2d 133 (Va. 1993).

In *Peace*, the Supreme Court of Virginia held that former employees did not employ "improper methods" when they relied solely on their memories to solicit customers after leaving their employer. *Id.* at 135–36. There was no dispute that the employees took no documents, customer lists, or other property belonging to the employer; rather, they compiled names and attendant contact information entirely from memory and contacted those customers after forming a competing business. *Id.* at 134–36. Further, it was "uncontroverted" that the defendants "relied solely upon their memories when they contacted [plaintiff's] customers." *Id.* at 135. No forensic investigation or other proof was offered to rebut that proposition. *See generally id.* On that record, the Virginia Supreme Court held that memory-based solicitation, standing alone, was permissible,

---

[12] *See* Suppl. Markfeld Decl. ¶ 17, ECF No. 44-1; Suppl. Geary Decl. ¶ 14, ECF No. 44-2.

while "reiterat[ing] that [the defendants] did not take any documents or utilize any property that belonged to [the plaintiff] when contacting his customers." *Id.* at 135.

*Peace's* reasoning is not novel. It is well settled in the Fourth Circuit that an employee does not misappropriate confidential information when he relies solely on his general knowledge, experience, and memory—rather than documents or other proprietary materials—acquired during the course of employment. *See, e.g.*, *Phoenix Renovation Corp. v. Rodriguez*, 258 F. App'x 526, 538–39 (4th Cir. 2007) (explaining that, upon termination, an employee may take with him the experience, knowledge, memory, and skill gained during employment).

Nonetheless, this case is readily distinguishable from *Peace*. Here, Plaintiff puts forth ample evidence that strongly undermines the contention that the Individual Defendants recalled Plaintiff's clients' contact information by relying solely on their memory, namely: Markfeld's printing of an extensive client list approximately five weeks before his resignation; the Individual Defendants' deletion activity a few days prior to their resignations; the Individual Defendants' downloading of confidential client information in the weeks leading up to their resignations; the Individual Defendants' personal email usage on their company computer; and Mayberry's contemporaneous resignation—all of which occurred shortly before the Individual Defendants' departure. On this record, the Court finds implausible Defendants' argument that the Individual Defendants retrieved Gallagher's clients' contact information solely from their memory. The far more realistic inference is that they took that information from Plaintiff.

And even assuming, *arguendo*, the Individual Defendants were capable of memorizing such voluminous client contact information, any such memory would necessarily be the product of their pre-resignation access to—and misuse of—Plaintiff's Confidential Information, rather than generalized knowledge acquired in the ordinary course of employment. A holding to the contrary would be unsound, as it would invite employees to evade their fiduciary obligations by

13

converting Confidential Information into "memory" on the eve of departure, thereby rendering duties of loyalty and confidentiality illusory. Such a result is inconsistent with Virginia's well-established fiduciary duty principles. Thus, whether the Individual Defendants departed with physical printed copies, transcribed copies, or memorized versions of Gallagher's Confidential Information, the result is the same on these facts: Plaintiff is likely to prevail on the merits of its breach of fiduciary duty of loyalty claims against the Individual Defendants.

2. Likelihood of Irreparable Harm Absent Preliminary Relief

It is well-settled in the Fourth Circuit that "permanent loss of customers to a competitor or the loss of goodwill constitutes irreparable injury." *Salomon & Ludwin, LLC v. Winters*, 150 F.4th 268, 278 n.7 (4th Cir. 2025) (collecting cases). This is especially true when the injured party suffers "millions of dollars transferred in the weeks following defendants' [resignation]" and loses a "substantial" number of clients. *Id.*

Here, Plaintiff lost a significant volume of business, totaling over 150 accounts. This is precisely the type of harm contemplated by the Fourth Circuit in *Salomon*. Accordingly, this factor too weighs in Plaintiff's favor.

3. Balance of Equities Tips in Plaintiff's Favor

Next, the Court must "balance the likelihood of harm to the plaintiff against the likelihood of harm to the defendant." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 271 (4th Cir. 2002). The balance of equities likewise weighs decisively in favor of injunctive relief. As explained above, Plaintiff is likely to succeed on its breach of fiduciary duty claims and is already suffering—and will continue to suffer—irreparable harm absent intervention. By contrast, Defendants face little to no cognizable hardship from an order preventing them from further soliciting Plaintiff's clients. *See Fid. Glob. Brokerage Grp., Inc.*, 2010 U.S. Dist. LEXIS 119121, at *9 (holding that an employee "loses nothing" from being barred from using confidential

14

customer information and his employer "is not harmed by an injunction" where it "is not entitled to the fruits of such efforts."). Moreover, a narrow injunction that prevents the Individual Defendants only from "*proactively* solicit[ing] Plaintiff's clients"—but does not "prevent Defendants from continuing to service the clients they have, nor . . . prevent them from adding new clients" further tips equities in Plaintiff's favor. *Salomon & Ludwin, LLC*, 741 F. Supp. 3d at 408 (emphasis in original); *see also U.S. Healthtek, Inc. v. Negosian*, 2025 U.S. Dist. LEXIS 36716, at *24 (E.D. Va. Feb. 28, 2025) (granting injunctive relief barring "only future solicitation" but otherwise allowing defendant "to continue servicing its existing clients"); *M Corp.*, 2024 U.S. Dist. LEXIS 202594, at *27 ("Narrowing the relief to temporarily prohibit Defendants from soliciting Plaintiff's clients and to prohibit only Sheridan from servicing clients that he serviced during his employment with Plaintiff allows Infinitive to service existing clients while preventing further harm to Plaintiff, thus balancing the equities by protecting Plaintiff's interests without unduly restricting Defendants' business activities.").[13]

### 4. Public Interest Favors Plaintiff

"The public interest favors the protection of confidential information." *Salomon & Ludwin, LLC*, 741 F. Supp. 3d at 408 (collecting cases). Accordingly, the issuance of a preliminary injunction here serves the public interest in safeguarding confidential information. And although Defendants aver that public interest is not served by an injunction because it usurps individuals' freedom to choose their financial advisor, the relief ordered here preserved the status quo by

---

[13] The Court notes that Plaintiff requested injunctive relief modeled on *M Corp.*, where former employees were barred from servicing clients they had improperly solicited. However, *M Corp.* did permit the former employees' new employer to continue servicing those same clients. Notably—and unlike here—*M Corp.* involved employees in the consulting industry. *M Corp.*'s approach is ill-suited to the wealth-management and financial-services context, which turns on "personal relationship[s] dependent on personal trust." *Prudential Sec. v. Plunkett*, 8 F. Supp. 2d 514, 520 (E.D. Va. 1998). Given the centrality of that relationship, "[c]lients should be free to deal with the broker of their choosing and not subjected to the turnover of their accounts to brokers unfamiliar to the client, absent informed consent." *Id.* at 521. This same policy consideration inspired the narrow injunctive relief granted in *Salomon*—on which the Court relies in fashioning the relief ordered here.

prohibiting the Individual Defendants only from using Gallagher's Confidential Information to solicit Gallagher's business, without disturbing the client transfers that have already taken place. Thus, the instant preliminary injunction strikes the delicate balance of protecting confidential information—while simultaneously respecting consumer choice by leaving undisturbed the client relationships that have already transitioned.

## B. Bond Requirement

Under Rule 65(c), a "party seeking a preliminary injunction . . . must post a bond in order to ensure a source of recovery in the event that the injunction is erroneous." *S&D Land Clearing v. D'Elegance Mgmt. Ltd.*, 34 F. App'x 885, 895 (4th Cir. 2002). As courts consider preliminary injunctions on an incomplete record, "the danger of a mistake . . . is substantial." *See Hughes Network Sys., Inc. v. InterDigital Comms Corp.*, 17 F.3d 691, 693 (4th Cir. 1994). The amount of bond to be required "ordinarily depends on the gravity of the potential harm to the enjoined party." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999). In calculating an injunction bond, "the district court should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order." *Id.*

Plaintiff argues that no bond should issue because Defendants lack a legitimate business interest in clients allegedly obtained through misuse of Gallagher's Confidential Information, and any lost opportunities resulting from an injunction would be self-inflicted rather than compensable harm. Reply Resp. Opp'n ("Reply") 11, ECF No. 45. Defendants disagree, contending that "a significant bond is required to address the harm to be suffered by the Defendants in the form of lost income through the duration of the injunction period." Resp. Opp'n 18.

The Court finds Plaintiff's position somewhat persuasive but nonetheless imposes a minimal bond of $50,000, "out of an abundance of caution." *M Corp.*, 2024 LEXIS 202594, at

16

*29 (requiring a $50,000 bond in a trade secret misappropriation case "out of an abundance of caution").

## C. Expedited Discovery

Plaintiff requests the Court order expedited discovery "in light of [the] Individual Defendants' efforts to suppress evidence of their reliance and use of Gallagher Confidential Information through deleting their browser history and files and their admissions regarding customer contacts . . . ." Suppl. Mem. Supp. 17. In Plaintiff's view "expedited discovery is particularly necessary in order to determine the full extent of Defendants' use of Gallagher's customer information." *Id.* at 18. Gallagher is particularly interested in "all communications with clients [the] Individual Defendants serviced while at Gallagher and an inspection of the devices used by [the] Individual Defendants in their possession, custody or control." *Id.*

Defendants counter that expedited discovery is uncalled for, stating this request was made "in the hope that [Plaintiff] can manufacture claims out of whole cloth against Defendants." Resp. Opp'n 19.

District courts enjoy broad discretion to supervise discovery. *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396 (4th Cir. 2014). Courts may allow discovery to begin before a Rule 26(f) conference occurs. Fed. R. Civ. P. 26(d)(1). However, "[t]he Federal Rules of Civil Procedure do not specify a standard for assessing when to grant Motions for Expedited Discovery, and the Fourth Circuit has not established one." *Does v. Musk*, 2025 U.S. Dist. LEXIS 100405, at *8 (D. Md. May 27, 2025). Nonetheless, Courts "in the Eastern District of Virginian[] apply a modified preliminary injunction test" to assess whether expedited discovery is warranted. *Kia Motors Am., Inc. v. Greenbrier GMC, Inc.*, 2020 U.S. Dist. LEXIS 252505, at *12 (E.D. Va. Dec. 11, 2020). This test "looks to whether the Plaintiff has made a strong showing of merits and irreparable harm to Plaintiff in the absence of expedited discovery and is justified by the idea that

17

granting court relief outside of the federal rules should be limited to unusual circumstances." *Id.* at *12–13 (cleaned up).

With this framework in mind, whether to grant expedited discovery turns on whether Plaintiff will suffer irreparable harm in the absence of the same. Plaintiff principally argues that spoliation concerns necessitate expeditated discovery. *See* Reply 11. The Court finds Plaintiff's arguments unpersuasive, as any spoliation concerns are more properly addressed at this juncture by a litigation hold. Accordingly, the Court denies Plaintiff's request for expedited discovery.

## IV. CONCLUSION

Accordingly, for the foregoing reasons and as otherwise stated from the bench during the December 11, 2025 preliminary injunction hearing, the Court granted in part and denied in part Plaintiff's Motion for Preliminary Injunction. *See* ECF No. 50.

_____/s/_____
Roderick C. Young
United States District Judge

Date: July 29, 2026
Richmond, Virginia

18