IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

ARTHUR J. GALLAGHER & CO.,⠀⠀⠀)
⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀Civil Action No. 3:25cv885 (RCY)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
ALAN MARKFELD, *et al.*,⠀⠀⠀⠀)
⠀⠀⠀Defendants.⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)

**MEMORANDUM OPINION**

This is a post-employment contract dispute brought by Plaintiff Arthur J. Gallagher & Co. ("Plaintiff" or "Gallagher"), wherein Plaintiff asserts various employment contract related claims against Alan Markfeld ("Markfeld"), Chris Geary ("Geary") (together, the "Individual Defendants"), and Granite Wealth Management, LLC ("GWM") (all three collectively, "Defendants"). The case is before the Court on Defendants' Motion to Dismiss. The motion has been fully briefed, and the Court dispenses with oral argument because the facts and legal contentions are adequately presented in the materials before the Court, and oral argument would not aid in the decisional process. E.D. Va. Loc. Civ. R. 7(J). For the reasons stated below, the Court will grant in part and deny in part Defendants' Motion to Dismiss.

**I. RELEVANT PROCEDURAL HISTORY**

Plaintiff commenced this action on October 27, 2025. Compl., ECF No. 1. On October 29, 2025, Plaintiff filed Motions for Injunctive Relief and a Memorandum in Support thereof with attendant affidavits. *See* ECF Nos. 10–12. After a series of briefing and two hearings, the Court granted Plaintiff's Motions for Injunctive Relief to the extent such relief was based on its breach of fiduciary duty of loyalty claims against the Individual Defendants. ECF No. 50. The Court, however, denied such relief to the extent it required the Court to enforce the non-acceptance,

non-service, and non-solicitation covenants (hereinafter, "Restrictive Covenants") contained in the Individual Defendants' Employment Agreements—finding Plaintiff failed to demonstrate that the Restrictive Covenants were enforceable at the preliminary injunction stage.  ECF No. 35. Following the Court's resolution of the Motions for Injunctive Relief, Plaintiff filed an Amended Complaint.  Am. Compl. ("FAC"), ECF No. 59.

On January 20, 2026, Defendants filed a Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6), Mot. Dismiss, ECF No. 60, and a Memorandum in Support thereof, Mem. Supp. Mot. Dismiss ("Mem. Supp."), ECF No. 61.  Plaintiff filed a Response to the same on February 3, 2026. Resp., ECF No. 62.  Defendants filed their Reply on February 9, 2026.  Reply, ECF No. 63.  The matter is accordingly ripe for review.

## II.  STANDARD OF REVIEW

### A.  Subject Matter Jurisdiction

A motion to dismiss under Rule 12(b)(1) tests a court's subject matter jurisdiction.  Motions under Rule 12(b)(1) fall into two different categories: a facial or a factual attack on jurisdiction. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).  On a factual attack, the movant "challenges the veracity of the facts underpinning subject matter jurisdiction."  *Id.* at 193. Conversely, on a facial attack, the movant does not challenge the veracity of the facts underpinning subject matter jurisdiction but instead argues that, taking the facts alleged as true, the complaint "fails to allege facts upon which subject matter jurisdiction can be based."  *Id*. at 192.  Facial challenges are assessed under the same standard as Rule 12(b)(6).  *Id.* at 193.[1]  The party asserting

---

[1] Defendants represent that their jurisdiction challenges are fact-based.  Mem. Supp. 4.  The Court disagrees. Defendants do not rebut any jurisdictional facts alleged in the FAC; instead, they argue (1) only the Financial Industry Regulatory Authority ("FINRA")—and not this Court—has subject matter jurisdiction to adjudicate claims involving brokerage services, Mem. Supp. 6, and (2) Plaintiff, as a non-FINRA member, lacks standing to assert claims regarding broker-dealer services, *id.* at 12–13.  Neither of these arguments reflect a challenge to the factual underpinnings of subject matter jurisdiction.  Rather, Defendants argue that the FAC—taking its allegations as true—"fails to allege facts upon which subject matter jurisdiction can be based[,]" i.e., a facial attack.  *Kerns*, 585 F.3d at 192.  Accordingly,

subject matter jurisdiction has the burden of establishing such jurisdiction. *Robb Evans & Assoc., LLC v. Holibaugh*, 609 F.3d 359, 362 (4th Cir. 2010).

Moreover, there is no subject matter jurisdiction where a party lacks standing. *See CGM, LLC v. BellSouth Telcoms., Inc.*, 664 F.3d 46, 52 (4th Cir. 2011) (internal citations omitted). "[T]he standing limitation is derived from the cases or controversies requirement of Article III." *White Tail Park, Inc. v. Strouble*, 413 F.3d 451, 459 (4th Cir. 2005). To establish standing, a plaintiff must show it "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

## B. Failure to State a Claim

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Megaro v. McCollum*, 66 F.4th 151, 157 (4th Cir. 2023) (quoting *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). Federal Rule of Civil Procedure 8 only requires that a complaint set forth "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," "detailed factual allegations" are not required in

the Court construes Defendants' jurisdiction arguments as such, applying the required Rule 12(b)(6) standard of review.

3

order to satisfy the pleading requirement of Federal Rule 8(a)(2). *Id.* (citations omitted). The plaintiff's well-pleaded allegations are assumed to be true, and the complaint is viewed in the light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993) (citations omitted); *see also Martin*, 980 F.2d at 952.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Labels and conclusions," a "formulaic recitation of the elements," and "naked assertions" without factual enhancement are insufficient. *Id.*

When deciding a motion to dismiss under Rule 12(b)(6), the Court "accept[s] as true the plaintiff's well-pleaded allegations and views all facts and draws all reasonable inferences in the light most favorable to plaintiff." *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Such a standard, however, does not require accepting any unreasonable inferences or a plaintiff's legal conclusions. *Id.* Additionally, at the motion to dismiss stage, the Court may consider the face of the complaint, documents attached to the complaint, documents attached to the motion to dismiss that are integral to the complaint and whose authenticity is unchallenged, and matters of public record subject to judicial notice. *Id.* Applying these standards, the Court construes the facts in the Complaint, including documents attached thereto (namely, the Individual Defendants' Employment Agreements), as follows.

### III.  FACTUAL ALLEGATIONS

This case arises from Gallagher's allegations that two of its former employees left the firm for a competitor after engaging in months of pre-resignation planning, using confidential business information, soliciting Gallagher's clients, and facilitating the transfer of client accounts.

Gallagher is a firm that provides wealth management services, including retirement, investment, and benefits consultation, to both individuals and companies.  FAC ¶ 1.  In addition to these services, Gallagher also assists clients in connecting with a broker-dealer, Osaic Wealth, Inc. ("Osaic"), for annuities and other non-retirement investment accounts.  *Id.* ¶ 21.  Gallagher receives certain fees for total assets under management ("AUM") placed with Osaic.  *Id.*

The Individual Defendants are former Gallagher financial advisors who both joined the firm in or around December 2022 and abruptly resigned on October 6, 2025.  *Id.* ¶¶ 2, 4.  During their tenure with Gallagher, the Individual Defendants were also employed by Osaic, and in this dual-role they rendered retirement- and brokerage-related services of approximately 750 Gallagher clients, some of which maintained accounts with both Gallagher and Osaic.  *Id.* ¶¶ 20–21.  The Individual Defendants' work required them to routinely access and review Gallagher's confidential business information ("Confidential Information").[2]  *Id.* ¶ 22.

Pursuant to their employment with Gallagher, the Individual Defendants executed Employment Agreements[3] that contain provisions concerning Restrictive Covenants; the usage of Gallagher's Confidential Information; employee solicitation; and a 21-day notice requirement

---

[2] "This confidential information includes but is not limited to:  client-specific information, including risk tolerances and preferences, net worth information, banking information, contact and family information, advisory fee rates, and data relating to Gallagher's unique marketing and servicing programs, procedures and techniques; investment, wealth management and retirement plan consulting, variable annuities, investment business strategies, and other information as further identified and defined in each Employee Agreement . . . ."  FAC ¶ 23.

[3] Both Markfeld's and Geary's Employment Agreements are attached to the FAC.  FAC Exs. 1–2, ECF Nos. 59-1, 59-2.  Because the Employment Agreements are identical, the Court refers only to the Markfeld Agreement from this point onwards.

prior to resignation.  *Id.* ¶¶ 3–6.  Gallagher alleges that the Individual Defendants breached each of these provisions and did so pursuant to a "scheme hatched with GWM" prior to their abrupt resignations.  *Id.* ¶¶ 4–6.  Specifically, Gallagher alleges that the Individual Defendants, GWM, and a non-party, Holly Mayberry[4] conspired together in an effort to steal Gallagher's Confidential Information for purposes of soliciting its clients.  *Id.* ¶ 44–62.  Plaintiff describes this scheme in great detail, alleging it began as early as June 26, 2025 (three months before Mayberry's eventual resignation, *supra* n.4):

> This pre-resignation scheme to harm Gallagher's business between [the] Individual Defendants, Mayberry and GWM is further supported through the trail Mayberry left on her Gallagher computer, which indicates, among things, that: (i) Mayberry had a "GWM Intro Meeting" as early as June 26, 2025; (ii) a "Granite Wealth Welcome Dinner" on July 23, 2025; (iii) a "Granite Wealth Meeting w/ Geary & Markfeld Group" on August 11, 2025; (iv) at least one "Transition Kick Off Call" with "Markfeld & Geary (Tuck-in_Non-Protocol)" on August 22, 2025; and (v) a "Weekly Touchpoint Call" with "Markfeld & Geary (Tuck-in_Non-Protocol)" on August 25, 2025.

*Id.* ¶ 52.[5]

Additionally, Gallagher points to pre-resignation activity involving the Individual Defendants and GWM, where the Individual Defendants began (1) communicating with GWM as early as July 31, 2025, and possessed draft employment agreement from GWM as early as mid-August 2025; (2) exporting and downloading reports from Gallagher's confidential Redtail customer database in late August and September 2025 onto their company computers; (3) printing out various books of business and customer files from Gallagher's Richmond office between

---

[4] "Mayberry was an account manager who worked closely with [the Individual Defendants] at Gallagher and serviced many of the same clients."  FAC ¶ 45.  Mayberry resigned a few weeks before the Individual Defendants (with her last day at Gallagher falling on September 26, 2025), representing that she no longer needed employment because her husband earned a new job.  *Id.* ¶ 46.  However, Mayberry began working at GWM shortly after terminating her employment with Gallagher.  *Id.*

[5] Gallagher's allegations stem from an internal forensic investigation into Mayberry's and the Individual Defendants' respective computers.  FAC ¶¶ 52–53.

August 2025 and early October 2025; and (4) deleting their company computers' browser history and certain other files right before submitting their resignations. *Id.* ¶ 53 (i)–(iii), (vi).

Further, Gallagher's investigation revealed that, from July 31, 2025, through October 3, 2025, Markfeld "searched for and used client names in Gallagher's Redtail database—some 882 queries by him during this period—in connection with searching for a fraction of the same customer names on spokeo.com and whitepages.com;" and, "[o]n August 29, 2025, Markfeld downloaded and printed out a Redtail report titled 'Client account report – Name, Age, client since, AUM portfolio value.csv,' which is a confidential Gallagher customer report that includes account information on the over 140 customers that" have since transferred to GWM. *Id.* ¶ 52 (iv)–(v).

Following this activity, and a few weeks after Mayberry resigned from Gallagher and joined GWM on September 26, 2025, the Individual Defendants met with Erica Lucke, a "leader" in Gallagher's office, to announce their resignations. *Id.* ¶ 48. During this meeting, Markfeld informed Lucke "that he had 'coached' Mayberry on how to resign from Gallagher so as not to raise suspicion of her recruitment to GWM and so that Mayberry could misrepresent the reason for her departure from Gallagher." *Id.* ¶ 49. Since the Individual Defendants' resignations, Gallagher has lost over 140 accounts to GWM and has lost AUM connected to accounts that moved to GWM from Osaic. *Id.* ¶ 59. "Of the more than 140 accounts lost, several have confirmed they received a contact or solicitation from either Markfeld, Geary, or both, and chose to move to GWM due to those solicitations[,]" *id.* ¶ 60, and "another five confirmed that Markfeld, Geary, or both met with them in early October, just prior to their departures," *id.* ¶ 61.

Based on the Individual Defendants' and Mayberry's abrupt resignations and subsequent GWM employment, Markfeld's comments to Lucke, Gallagher's forensic investigation, and "[u]pon information and belief," Gallagher alleges that the "Individual Defendants moved Mayberry to GWM in advance of their Gallagher departures so that she could begin working with

7

GWM to generate transfer documents and other account documents for the clients the Individual Defendants intended to solicit and accept at GWM, allowing Markfeld and Geary to hit the ground running before Gallagher had time to save the business." *Id.* ¶ 50. Plaintiff states that this conclusion is reinforced by the speed with which some customers transferred to GWM. *Id.* ¶ 51 (alleging that "some accounts mov[ed] within 24 hours of [the] Individual Defendants' departure").

## IV.  ANALYSIS

Based on the aforementioned facts, Plaintiff asserts seven causes of action arising from the Individual Defendants' alleged pre- and post-resignation activity and subsequent employment at GWM:  Breach of the Markfeld Agreement against Markfeld (Count I); Breach of the Geary Agreement against Geary (Count II); Tortious Interference with Contract against GWM (Count III); Breach of Fiduciary Duty against Markfeld (Count IV); Breach of Fiduciary Duty against Geary (Count V); Aiding and Abetting Breach of Fiduciary Duty of Loyalty against GWM (Count VI); and Conspiracy to Injure Trade and Business, in violation of Va. Code §§ 18.2-499-500 against all Defendants (Count VII).  FAC ¶¶ 72–108.

Defendants move to dismiss all claims in the FAC to the extent they relate to the Individual Defendants' provision of brokerage services pursuant to Rule 12(b)(1), contending that such issues must be arbitrated with the Financial Industry Reguflatory Authority ("FINRA").[6]  Separately, Defendants move to dismiss Counts I and II—but only to the extent such counts are based on the

---

[6] FINRA was established under Section 15A of the Securities Exchange Act of 1934, 15 U.S.C. § 78o-3, and is vested with the "authority to exercise comprehensive oversight over all securities firms that do business with the public." *UBS Fin. Servs. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 648 (2d Cir. 2011) (quoting *Sacks v. SEC*, 648 F.3d 945, 948 (9th Cir. 2011)).

enforcement of the Employment Agreements' Restrictive Covenants[7]—and Counts III, VI, and VII.

The Court addresses these claims as follows. First, the Court addresses Defendants' jurisdictional challenges. As explained below, the Court rejects Defendants' arguments that FINRA arbitration deprives the Court of subject-matter jurisdiction and that Plaintiff lacks standing to pursue claims arising from brokerage-related services. Accordingly, Defendants' Rule 12(b)(1) motion will be denied.

Second, the Court considers Defendants' Rule 12(b)(6) arguments. For the reasons articulated herein Plaintiff plausibly states a claim for relief as to all challenged counts except Count III, tortious interference. Accordingly, the Court will grant Defendants' Rule 12(b)(6) motion only as to Count III and will deny the motion in all other respects.

## A.  12(b)(1) Analysis

The Court finds Defendants' jurisdictional challenge unavailing and therefore denies Defendants' motion to dismiss as it relates to the same. First, FINRA does not have exclusive jurisdiction to resolve all claims stemming from brokerage services. Second, Defendants' standing arguments are without merit.

### 1.  FINRA Jurisdiction

Defendants contend that this Court lacks subject matter jurisdiction to adjudicate claims involving brokerage services, positing that FINRA has exclusive jurisdiction over such disputes,

---

[7] Plaintiff alleges four distinct contractual breaches:  (1) misuse of confidential information; (2) failure to provide 21 days' notice prior to resignation; (3) improper solicitation of Mayberry; and (4) breach of the Restrictive Covenants.  *See* FAC ¶¶ 52–58, 79–80, 91–92.  Defendants challenge only the latter alleged breach, and only on enforceability grounds.  Defendants do not challenge whether Plaintiff plausibly alleges such breaches occurred.  Nor do Defendants challenge whether Plaintiff plausibly alleges that the Individual Defendants breached the fiduciary duty of loyalty underlying Counts IV and V.  Accordingly, for purposes of this Opinion, the Court assumes sufficiency of Plaintiff's allegations concerning the contractual breaches and that the Individual Defendants breached their respective fiduciary duties of loyalty.

Mem. Supp. 6–10, and because the Individual Defendants provided brokerage services to Gallagher clients, that exclusive jurisdiction is triggered. Specifically, Defendants argue that, because FINRA's "arbitration services apply to disputes arising out of 'the *business activities* of a brokerage firm or one of its brokers[,]'" *id.* at 7 (quoting Arbitration & Mediation, FINRA, https://www.finra.org/arbitration-mediation (last visited Jan. 16, 2026) (emphasis added)), Plaintiff's brokerage-related claims must be addressed in a FINRA arbitration proceeding by the applicable broker-dealer—in this case, Osaic. Reply 6. Defendants maintain this view, notwithstanding the undisputed fact that Plaintiff is not a FINRA member or associated person. *Id.* at 1.

Additionally, Defendants argue that the Individual Defendants' Employment Agreements further demonstrate that brokerage-related disputes must be resolved in FINRA arbitration. *Id.* at 9 (citing Employment Agreement § 12(C) (which states, in relevant part: "the Parties agree, except as may otherwise be required by applicable law, rule or regulation (including FINRA regulations), that the sole and exclusive venues of any dispute between the Parties with respect to this Agreement, or any matters related thereto, will be a state trial or federal district court located within the federal judicial district where Employee resides or where Employee is principally employed . . .")). Defendants posit that "[t]he only reasonable interpretation of [§ 12(C)] is that [Gallagher] fully contemplated that some services performed by the Individual Defendants pursuant to the Employment Agreements, e.g., the provision of brokerage services, are governed by FINRA's Rules and Regulations and FINRA would be the forum of such claims." Reply 10 (citing FINRA Rule 13200). In Defendants' view, to interpret § 12(C) any differently would render the provision meaningless. *Id.* (citing *Va. is for Movers, LLC v. Apple Fed. Credit Union*, 720 F. Supp. 3d 427, 436 (E.D. Va. 2024) ("No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it; and there is no presumption that the parties have not used

10

the words needlessly." (cleaned up))). Finally, Defendants cite public-policy considerations to support the proposition that the brokerage-related claims must be reserved for FINRA arbitration. Mem. Supp. 10–12. Defendants' arguments are unavailing.

First, and as Defendants acknowledge, FINRA's arbitration provisions do not apply to Plaintiff—as it is not a FINRA member or associated person. *See* FINRA Rule 13200(a) (requiring FINRA arbitration for certain brokerage disputes between or among "Members; Members and Associated Persons; or Associated Persons); *see also* FINRA Rule 12200 (requiring FINRA arbitration for certain brokerage disputes "between a customer and a member or associated person of a member"). That the Employment Agreements broadly reference FINRA regulations is of no moment. Whatever the meaning attributable to § 12(C), it must be reasonable. *See Va. is for Movers*, 720 F. Supp. 3d at 436 ("No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it . . . ."). It is patently unreasonable to interpret § 12(C) to trigger the application of FINRA rules and regulations (including arbitration) when Gallagher is unquestionably not a FINRA member. Indeed, Defendants cite Rule 13200(a) to support its proposition that § 12(C) contemplates FINRA arbitration—notwithstanding the fact that Rule 13200(a), by its own terms, does not apply to Gallagher.

Second, while FINRA's rules require its members (such as Osaic) to arbitrate certain brokerage-related disputes, Fourth Circuit jurisprudence is clear that such arbitration requirements may be waived. *See USB Fin. Servs. v. Carilion Clinic*, 706 F.3d 319, 328 (4th Cir. 2013) ("[T]he obligation to arbitrate under FINRA Rule 12200 can be superseded and displaced by a more specific agreement between the parties." (collecting cases)). Indeed, as this Court has previously explained, "the [Federal Arbitration Act] does not divest federal courts of otherwise-possessed subject matter jurisdiction over disputes subject to arbitration agreements." *Colonial River Wealth Advisors, LLC v. Cambridge Inv. Rsch., Inc.*, 2023 WL 4708086, at *4 (E.D. Va. July 24, 2023).

Thus, it follows that FINRA's arbitration rules and regulatory scope do not divest courts of jurisdiction to hear claims that otherwise fall within its purview.

Defendants' public-policy concerns do not compel a different result.[8]  Had it been the intention for FINRA to govern disputes such as this, its arbitration rules would not narrowly apply only to members, associated persons, and customers.  Accordingly, Defendants' argument to the contrary is without merit.

### 2. Standing

Defendants raise two distinct standing arguments:  (1) Gallagher lacks a "personal stake" as to its brokerage-service-related claims because it "cannot suffer any alleged injury for claims relating to the provision of brokerage services," since it is not a broker; and (2) this Court cannot redress Gallagher's alleged injuries because FINRA—and not this Court—has exclusive jurisdiction over brokerage disputes.  Mem. Supp. 12–14.  The latter argument is foreclosed for the reasons articulated *supra*.  The former warrants further discussion.

Defendants contend that the true aggrieved party with respect to the brokerage-related injuries is Osaic, not Gallagher.  *Id.* at 13.  Specifically, Defendants aver that "the proper course for [Gallagher] to recover for any alleged injury arising from claims involving brokerage services is to recoup any recovery awarded to its associated vendor, Osaic, once FINRA's arbitration and dispute resolution procedures are exhausted."  *Id.*  Defendants advance this theory even though Gallagher alleges a concrete economic injury stemming from the Individual Defendants' provision of brokerage services:  "Gallagher has lost AUM connected to Restricted Clients who have moved to GWM from Osaic, causing Gallagher to lose additional revenues through Defendants' violations."  Reply 8 (quoting FAC ¶ 59).  Defendants cite no authority for the proposition that a

---

[8] Defendants' policy argument is, in part, based on the false premise that "FINRA has exclusive jurisdiction to adjudicate disputes arising from the provision of brokerage services."  Mem. Supp. 11.  As explained *supra*, FINRA does not maintain exclusive jurisdiction to resolve disputes arising from the provision of brokerage services.

plaintiff alleging a direct loss of revenue from a defendant's conduct lacks Article III standing merely because another entity may also have suffered injury or may possess an independent cause of action. Accordingly, this standing argument likewise fails.

**B. 12(b)(6) Analysis**

The Court finds Plaintiff alleges facts sufficient to plausibly state a claim upon which relief can be granted as to all challenged counts except Count III, tortious interference. The Court addresses the challenged counts in numerical order.

**1. The Individual Defendants—Breach of Employment Agreements (Counts I & II)**

Defendants argue that, to the extent Plaintiff's Breach of Employment Agreement claims stem from the Restrictive Covenants, those claims must be dismissed because the Restrictive Covenants are unenforceable. Mem. Supp. 14. Thus, Defendants move to dismiss these Counts only in part. In support, Defendants rely almost exclusively on the Court's prior determination at the preliminary-injunction stage that Plaintiff failed to establish a likelihood of success on the merits as to the enforceability of the Restrictive Covenants. *Id.* That reliance is misplaced.

While the Court previously found—at the preliminary-injunction stage—that Plaintiff failed to carry its burden to demonstrate a likelihood of success on the merits as to the enforceability of the Restrictive Covenants, that preliminary determination does not compel dismissal at the pleading stage.

As the Supreme Court of Virginia has made clear with respect to demurrers (and as applied to the Rule 12(b)(6) analog here), such initial pleading challenges to restrictive covenants "cannot be used to decide on the merits whether a restraint on competition is enforceable" and such a ruling would "incorrectly short-circuit[] litigation pretrial and decide[] the dispute without permitting the parties to reach a trial on the merits." *Assurance Data, Inc. v. Malyevac*, 747 S.E.2d 804, 805 (Va. 2013). Thus, although the Court previously questioned whether Plaintiff could ultimately justify

13

the breadth of the Restrictive Covenants, *Assurance Data* makes clear that Plaintiff is entitled to develop an evidentiary record before the Court resolves that question as a matter of law. *See also Tactical Rehab., Inc. v. Youssef*, 2024 WL 4712696, at *7 (E.D. Va. Nov. 7, 2024) ("As *Assurance* counsels, Defendants' argument is premature. The parties may proceed to discovery and Youssef may renew her arguments regarding overbreadth and vagueness after a factual record has been developed.").

Accordingly, although the Court's preliminary injunction ruling identified substantial concerns regarding the enforceability of the Restrictive Covenants—particularly the non-service and non-acceptance provisions—that assessment was rendered on a limited record and therefore does not warrant dismissal as a matter of law at the pleading stage.

### 2. GWM—Tortious Interference (Count III)

Plaintiff's tortious interference claim fails because the FAC does not plausibly allege that GWM knew of the Employment Agreements' relevant provisions. The necessary elements to establish a prima facie case for tortious interference with contract rights are: "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 318 (Va. 2014). Additionally, if a contract is terminable at will, a plaintiff "must allege . . . not only an intentional interference, but also that the defendant employed 'improper methods.'" *Id.* (collecting cases) (cleaned up).

Defendants contend that Plaintiff fails to demonstrate each element of the offense. Mem. Supp. 16–19. The Court agrees that Plaintiff fails to plausibly allege that GWM possessed actual

or constructive knowledge of the Employment Agreements and the terms contained therein. Accordingly, Plaintiff fails to satisfy the knowledge element of its tortious interference claim.[9]

"[T]he defendant must have actual knowledge of the existence of the business relationship or knowledge of facts that, upon reasonable inquiry, should lead to disclosure of the existence of the contract or potential business relationship[,]" i.e., constructive knowledge. *Simbeck, Inc. v. Dodd-Sisk Whitlock Corp.*, 44 Va. Cir. 54, 62 (1997), *aff'd* 508 S.E.2d 601 (1999). Plaintiff alleges both actual and constructive knowledge, *see* FAC ¶ 99, but these are legal conclusions and so not entitled to a presumption of truth. Neither theory is plausibly supported by the factual allegations in the FAC.

Specifically, Plaintiff alleges that "GWM knew or should have known of the Client Restrictions, Employee Restrictions, and confidentiality provisions that Markfeld and Geary agreed to and were bound, including because such restrictions are [1] common in this industry, [2] Geary and Markfeld were required to disclose the restrictions to GWM, and [3] GWM is likely to utilize materially similar restrictions with similarly-situated employees." *Id.* (bracketed numbering added). Defendants argue that these allegations are insufficient to demonstrate actual or constructive knowledge. Mem. Supp. 18 (citing *Beacon Sales Acquisition, Inc. v. Cameron Ashley Bldg. Prods., Inc.*, 2025 WL 3721684, at *14 (E.D. Va. Dec. 23, 2025) (finding no likelihood of success on the merits of a tortious interference claim when the plaintiff "supplies no facts that supports its allegations that [defendant] knew of the existence–let alone the *contents*–of Plaintiff's agreements with its employees." (emphasis in original))). The Court agrees.

---

[9] Although Plaintiff's failure to plausibly allege knowledge is dispositive, the Court briefly addresses Defendants' argument regarding contractual enforceability. Defendants argue that, to the extent Plaintiff's tortious interference claim stems from the Individual Defendants' alleged violations of the Restrictive Covenants, the claim fails because the "Individual Defendants had no contractual obligation to refrain from engaging in these acts"— meaning Gallagher "could not have tortiously interfered with those unenforceable obligations." Mem. Supp. 18. The Court disagrees; as articulated *supra*, *Assurance Data* bars courts from dispositively deciding enforceability in a factual vacuum on a motion to dismiss. Accordingly, because Plaintiff alleges it entered into Employment Agreements with the Individual Defendants, it satisfies the first element of its tortious interference claim.

Plaintiff's allegations of knowledge are speculative and insufficient to establish either actual or constructive knowledge. First, Plaintiff's contention that GWM had knowledge of the Employment Agreements' restrictions because the Employment Agreement required the Individual Defendants to disclose them to GWM certainly fails. This allegation establishes, at most, that the Individual Defendants had a contractual obligation to disclose the agreement to GWM. But the existence of such an obligation does not plausibly establish that the disclosures were ever made or that GWM otherwise acquired knowledge of the Employment Agreements' term. Indeed, Plaintiff's theory requires the Court to infer that the Individual Defendants complied with the disclosure provision despite allegedly breaching numerous other provisions in the same agreements—an inference the Court declines to draw.

Second, Plaintiff's bald assertions that the restrictions are common in the industry and that GWM is likely to utilize materially similar restrictions with similarly situated employees also fail. Even accepting those allegations as true, they do not plausibly establish that GWM had knowledge of these particular agreements or their terms. Indeed, Plaintiff cites no authority holding that a defendant's knowledge, constructive or otherwise, of a contract may be plausibly inferred solely from a contractual disclosure provision and generalized allegations that similar restrictions are commonplace within the industry. *See Lokhova v. Halper*, 995 F.3d 134, 148 (4th Cir. 2021) (recognizing plaintiff must allege facts that move allegations regarding "knowledge of contractual rights or business expectancies" beyond "speculative conclusions"). Thus, as in *Beacon Sales*, "Plaintiff supplies no facts that supports its allegations that [GWM] knew of the existence–let alone the *contents*–of Plaintiff's agreements with its employees." 2025 WL 3721684, at *14. Accordingly, Plaintiff's allegations fail to plausibly establish actual or constructive knowledge based on either industry custom or the Employment Agreements' disclosure provisions.

16

Plaintiff separately alleges that GWM had notice of the Employment Agreement "following cease and desist letters from Gallagher during the Individual Defendants' 21-day notice period." Resp. 16 (citing FAC ¶ 57 ("[The] Individual Defendants continue to solicit Restricted Clients, despite multiple cease and desist demands . . . .")). But this allegation likewise fails to establish the requisite notice. As an initial matter, it is not clear whether this allegation asserts such letters were sent *to GWM*. And even assuming the FAC can be plausibly construed to allege as much, it contains no specifics as to when these letters were sent to GWM. In its response, Plaintiff does point to a specific letter it sent to GWM on October 21, 2025. Resp. 16, n.10 (citing Mem. Supp. TRO and Prelim. Inj. Ex. 7, ECF No. 12-7). Even assuming the Court can consider Plaintiff's letter,[10] it does not establish GWM's requisite knowledge of the Employment Agreements' terms sufficient to satisfy the knowledge element of a tortious interference claim.

First, the FAC is devoid of any specific allegations regarding conduct occurring after October 21, 2025. *See generally* FAC. Second, while the letter represents Gallagher "believe[s] GWM [was] aware of [prior] correspondence" directed to the Individual Defendants concerning their alleged contractual violations, it is likewise unclear (1) whether GWM was, in fact, aware of such correspondence; (2) whether such correspondence was sufficient to inform GWM of the contents of the Individual Defendants' Employment Agreements; and (3) precisely when such correspondence took place, further obfuscating the timing of GWM's alleged knowledge of the Employment Agreements. Accordingly, neither the FAC nor the October 21, 2025 letter plausibly establishes that GWM possessed knowledge of the Employment Agreements before engaging in any allegedly tortious conduct.

---

[10] The Court may consider documents that are "integral to and explicitly relied on in the complaint" so long as there are no authenticity challenges. *See Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). It is questionable whether the October 21, 2025 letter qualifies as such a document, but the Court considers it anyway— without deciding whether it is proper to do so—since it does not alter the analysis here.

17

This finding is reinforced by GWM's alleged intentional interference. Plaintiff's own allegations concerning GWM's purported interference underscore the absence of well-pleaded facts establishing when GWM acquired knowledge of the Employment Agreements: "As to GWM's intentional interference, Gallagher plainly alleges (and it is undisputed) that Markfeld and Geary accessed and downloaded reports from Gallagher's confidential Redtail customer database from late July through October 2025." Resp. 16 (citing FAC ¶¶ 52–53).[11] Critically, the conduct described in FAC ¶¶ 52–53 predates GWM's alleged knowledge of the Employment Agreements, even assuming GWM acquired such knowledge by way of the letters on October 21, 2025. *See* FAC ¶¶ 52–53 (describing events occurring between June 26, 2025 and sometime before October 6, 2025). The FAC identifies no specific conduct by GWM occurring after October 21, 2025, that plausibly constitutes intentional interference with the Employment Agreements.

Accordingly, Plaintiff fails to plausibly allege either that GWM possessed the requisite knowledge of the Employment Agreements or that GWM engaged in tortious conduct after acquiring such knowledge. Count III will therefore be dismissed.

---

[11] Plaintiff also cites the Individual Defendants' declarations—which are not incorporated in or attached to the FAC, but rather were filed earlier in this matter, during the injunctive relief proceedings—to support its proposition that GWM asked the Individual Defendants to share Gallagher's Confidential Information, Resp. 16, n.9 (citing ECF Nos. 44-1 (¶ 12), 44-2 (¶ 12)), and that GWM helped the Individual Defendants copy Gallagher's Confidential Information and solicit Gallagher's Restricted Clients during the notice period, Resp. 17–18, n.15 (citing ECF Nos. 44-1 (¶ 17), 44-2 (¶ 14)). Defendants disagree with Plaintiff's interpretation of these declarations. Reply 15 (arguing that the declarations reference only FiNet—not GWM). Generally, in resolving a motion to dismiss, a court's review is confined to the complaint, documents attached thereto or incorporated by reference, documents integral to the complaint, and matters properly subject to judicial notice. *Philips*, 572 F.3d at 180. Here, only the final avenue of consideration is even potentially applicable to the declarations. "Although a court may take judicial notice of declarations previously filed in the matter pursuant to Federal Rule of Evidence 201 . . . a court should not do so on a motion to dismiss where the facts presented in those declarations are 'subject to reasonable dispute.'" *Variscite, Inc. v. City of Los Angeles*, 2023 WL 3493557, at *5 (C.D. Cal. Apr. 11, 2023) (cleaned up) (quoting Fed. R. Evid. 201(b)). "A fact is 'not subject to reasonable dispute' [only] if it 'is generally known' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably questioned.'" *Id.* (quoting Fed. R. Evid. 201(b)(1)–(2)).

Plaintiff relies on the aforementioned declarations to establish that GWM requested and solicited Gallagher's Confidential Information, yet the declarations expressly refer only to FiNet. Plaintiff offers no basis for treating references to FiNet as references to GWM. Put simply, Plaintiff asks the Court to assume that references to FiNet encompass GWM. But that proposition is neither "generally known" nor "capable of accurate and ready determination" from the declarations themselves. Fed. R. Evid. 201(b). Rather, it is a disputed inference that renders the declarations improper for judicial notice.

### 3. GWM—Aiding and Abetting Breach of Fiduciary Duty of Loyalty (Count VI)

Virginia law is unsettled as to whether a separate cause of action for aiding and abetting a breach of fiduciary duty exists under Virginia law. *See Keil v. Seth Corp.*, 2021 WL 5088242, at *12–14 (E.D. Va. June 4, 2020) (collecting cases). Virginia courts have taken three separate approaches: some (1) recognize such a cause of action, *see AvalonBay Cmtys., Inc. v. Willden*, 2009 WL 2431571, at *11 (E.D. Va. Aug. 7, 2009) (holding a defendant liable for aiding and abetting his brother's breach of fiduciary duty when he processed fraudulent invoices that harmed his brother's employer, AvalonBay); (2) outright dismiss such claims, *see Infinity Tech. LLC v. Burney*, 2020 WL 6387378, at *6 (E.D. Va June 4, 2020) ("Because neither the Supreme Court of Virginia nor the Virginia General Assembly has adopted an independent cause of action for aiding and abetting a tort, plaintiff's claim against defendant CCS for aiding and abetting breach of fiduciary duty and misappropriation of trade secrets must be dismissed."); or (3) recognize the related doctrine of joint tortfeasor liability in its place, *see Keil*, 2021 WL 5088242, at *14 (relying on the Virginia Supreme Court's decision in in *Patteson v. Horsley*, 70 Va. 263 (1877)).

"If state law is unclear or unsettled, a federal court must determine the rule that the state supreme court would probably follow, not fashion a rule which an independent federal court might consider best." *Meadow Ltd P'ship v. Heritage Sav. & Loan Ass'n*, 639 F. Supp. 643, 653 (E.D. Va. 1986). Anchored by this principle, and finding Judge Novak's reasoning persuasive in *Keil*, the Court predicts that the Supreme Court of Virginia would not recognize an independent cause of action for aiding and abetting a breach of fiduciary duty. Rather, Virginia law permits recovery under a theory of "joint tortfeasor liability when a party knows of a breach of trust and participates in it for his own benefit." *Keil*, 2021 WL 5088242, at *14.

"To hold a defendant jointly liable for breach of fiduciary duty, a plaintiff must show that a defendant: (1) knows about another's duty and breach; (2) participates in it or directs its

19

commission; and, (3) benefits from it." *Id.* (internal citation and quotations omitted). Defendants challenge Plaintiff's joint tortfeasor claim solely on the premise that Plaintiff "alleged no facts asserting what GWM purportedly did to aid and abet the Individual Defendants in any asserted breach of fiduciary duty." Mem. Supp. 21. In Defendant's view, Plaintiff merely "asserts that GWM met with and offered employment to the Individual Defendants, conduct not actionable in tort." *Id.* The Court disagrees.

Construing the FAC in the light most favorable to Plaintiff, the Court finds Plaintiff plausibly alleges that GWM participated in the Individual Defendants' alleged breach of fiduciary duty. Specifically, Plaintiff details the results of its investigation wherein it discovered the following chain of events:

- June 26, 2025: Mayberry meets with GWM for a "GWM Intro Meeting;"

- July 23, 2025: GWM hosts a "Granite Wealth Welcome Dinner" with Marberry;

- July 31, 2025: the Individual Defendants began communicating with GWM;

- July 31, 2025 – October 3, 2025: "Markfeld searched for and used client names in Gallagher's Redtail database—some 882 queries by him during this period—in connection with searching for a fraction of the same customer names on spokeo.com and whitepages.com;"

- August 11, 2025: a meeting occurred with the Individual Defendants and/or Mayberry;

- Mid-August 2025: the Individual Defendants receive draft agreements from GWM;

- August 22, 2025: a meeting occurred with the Individual Defendants and/or Mayberry, titled "Transition Kick Off Call" with "Markfield & Geary (Tuck-in_Non-Protocol);"[12]

---

[12] Plaintiff represents that "[a] tuck-in acquisition involves a larger company completely absorbing another, usually smaller, company and integrating it into its own platform." Resp. 17 (quoting https://www.investopedia.com/terms/t/tuckinacquisition.asp). While Defendants criticize Plaintiff's reliance on this definition, they offer no alternative definition for the term. At this stage, and "view[ing] the [FAC] in the light most

- August 25, 2025: a meeting occurred with the Individual Defendants and/or Mayberry, titled "Weekly Touchpoint Call" with "Markfeld & Geary (Tuck-in_Non-Protocol);"

- Late August – September 2025: the Individual Defendants "exported and downloaded reports from Gallagher's confidential Redtail customer database;"

- August 29, 2025: "Markfeld downloaded, and printed out, the same Redtail report— 'Client account report – Name, Age, client since, AUM portfolio value.csv,' which is a confidential Gallagher customer report that includes account information on the over 140 customers that Defendants have unlawfully diverted to date from Gallagher[;]"

- Late August – early October 2025: the Individual Defendants "printed out various books of business and customer files from Gallagher's Richmond office;"

- October 6, 2025: the Individual Defendants "deleted their company computers' browser history, and Markfeld deleted numerous files from his computer[,]" and, on the same date, Markfeld informed Lucke "that he had 'coached' Mayberry on how to resign from Gallagher so as not to raise suspicion of her recruitment to GWM and so that Mayberry could misrepresent the reason for her departure from Gallagher;" and

- October 7, 2025: some of Gallagher's clients begin transitioning to GWM "within 24 hours of [the] Individual Defendants' departure."

FAC ¶¶ 49–53.

Defendants characterize GWM's pre-resignation meetings with the Individual Defendants as nothing more than lawful recruiting efforts. At this stage, however, the Court must draw reasonable inferences in Plaintiff's favor, and the FAC plausibly supports a different inference.

---

favorable to [P]laintiff," *Philips*, 572 F.3d at 180, the Court accepts Plaintiff's proffered definition for purposes of resolving the instant motion.

Most significant are the allegations that GWM repeatedly discussed a "tuck-in" transaction with the Individual Defendants and/or Mayberry just prior to their respective departures. This, coupled with the fact that Gallagher clients began transitioning to GWM within twenty-four hours of the Individual Defendants' departures, supports the inference that the Individual Defendants coordinated with GWM to materialize these results. Indeed, although the phrase "tuck-in" in the finance space traditionally refers to a larger company absorbing a smaller business, *see* supra n.12, Plaintiff plausibly alleges that the term was used here to describe GWM's planned transition of the Individual Defendants and the clients they serviced at Gallagher. The alleged immediacy of the client transition further supports a reasonable inference that the transition had been planned in advance rather than resulting from ordinary post-resignation recruiting efforts.

Other allegations reinforce that inference. Plaintiff alleges repeated transition-related meetings, exchange of draft agreements, Mayberry's departure for GWM before the Individual Defendants and Markfeld's alleged efforts to coach that departure, and the subsequent retrieval and printing of large volumes of Gallagher's Confidential Information. Viewed as a whole, these allegations plausibly suggest that GWM knowingly participated in the Individual Defendants' alleged breach of fiduciary duty and stood to benefit from the same.

Accordingly, Plaintiff plausibly alleges joint tortfeasor liability and Count VI survives Defendants' motion to dismiss.

### 4. All Defendants—Conspiracy to Injure Trade and Business (Count VII)

Virginia Code § 18.2-500 "provide[s] civil relief including treble damages, for persons 'injured in his reputation, trade, business or profession by reason of a violation of § 18.2-499.'" *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 317 (Va. 2014) (quoting Va. Code § 18.2-500). Code § 18.2-499 imposes criminal liability on

> [a]ny two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in

22

his reputation, trade, business or profession by any means whatever or (ii) willfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act.

Recovery pursuant to these statutes requires a showing that: "(1) a combination of two or more persons for the purpose of willfully and maliciously injuring plaintiff in his business; and (2) resulting damage to plaintiff." *Id.* at 317 (internal citations and quotations omitted). Additionally, "actions for common law civil conspiracy and statutory business conspiracy lie only if a plaintiff sustains damages as a result of an act that is itself wrongful or tortious." *Id.* (collecting cases). Further, "statutory business conspiracy must be pleaded with particularity." *Beacon Sales*, 2025 WL 3721684, at *14. Indeed, "[a] claim for civil conspiracy fails if the plaintiff 'fails to allege with any specificity the persons who agreed to the alleged conspiracy, the specific communications amongst the conspirators, or the manner in which any such communications were made.'" *Power Home Solar, LLC v. Sigora Solar, LLC*, 2021 WL 3856459, at *12 (E.D. Va. Aug. 30, 2021) (quoting *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011) (affirming the dismissal of a civil conspiracy claim under 42 U.S.C. § 1985(3) on a motion to dismiss)).

Thus, to plausibly state a claim, Plaintiff must allege—with particularity—that (1) multiple participants (2) collectively committed a wrongful or tortious act (3) for the purpose of willfully and maliciously injuring Plaintiff in his business, and (4) resulting in damages. Plaintiff meets this threshold. Plaintiff specifically alleges multiple participants (the Individual Defendants and GWM) collectively committed a wrongful or tortious act (the Individual Defendants' breaches of fiduciary duty and GWM's participation in the same as a joint tortfeasor—both of which are supported by particularized allegations describing in detail the alleged pre-employment scheme conducted by the Individual Defendants and GWM) for the stated purpose (stealing Plaintiff's customers), and consequent harm and damages (Plaintiff's loss of customers and AUM fees). Accordingly, Count VII survives Defendants' Motion to Dismiss.

23

## V. CONCLUSION

For the reasons detailed above, Defendants' Motion to Dismiss will be granted in part and

denied in part.

An appropriate Order shall issue.

_____/s/_____

Roderick C. Young

United States District Judge

Date: July 29, 2026
Richmond, Virginia